[No. S005870. June 18, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID ALLEN RALEY, Defendant and Appellant.

## COUNSEL

Doron Weinberg, under appointment by the Supreme Court, Lynne S. Coffin and Denise Kendall for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant David Allen Raley was convicted by a jury of first degree murder (Pen. Code, § 187)[1] of Jeanine G., with personal use of a deadly weapon (§ 12022, subd. (b)). The jury found true two special circumstance allegations: murder in the commission of a kidnapping (§ 190.2, subd. (a)(17)(ii)), and torture murder (§ 190.2, subd. (a)(18)). The jury also found defendant guilty of attempted murder of Laurie M. (§§ 664, 187), and found true allegations defendant personally used a deadly weapon and inflicted great bodily injury. (§§ 12022, subd. (b), 12022.7.) In addition, the jury convicted defendant of attempted oral copulation by force against Jeanine G. (§§ 664, 288a, subd. (c)), with use of a deadly weapon (§ 12022.7); oral copulation by force against Laurie M. (§ 288a, subd. (c)), with use of a deadly weapon and great bodily injury (§§ 12022, subd. (b), 12022.7); and two counts of kidnapping (§ 207) with use of a deadly weapon and infliction of great bodily injury (§§ 12022, subd. (b), 12022.7).

At the conclusion of the first penalty trial, the jury was unable to reach a verdict. At the conclusion of the second penalty trial, the jury fixed the penalty at death. This appeal is automatic. We conclude that we should reverse the conviction for attempted oral copulation, but otherwise affirm the judgment.

### I. FACTS

#### A. *Guilt Phase*

##### 1. *Prosecution Case*

Defendant was a security guard who worked at the Carolands mansion in Hillsborough. The mansion was not open to the public, but defendant gave

---

[1]All further statutory references are to the Penal Code unless otherwise noted.

unauthorized tours of the place occasionally to young people, usually high school age girls. Witnesses who had taken these tours said defendant asked them to go into rooms and scream, to demonstrate how soundproof the place was. His tours were marked by some salacious commentary. He insisted that one young woman go into a safe, and commented to her that he could kill someone in the basement and no one would hear any screams.

On Saturday, February 5, 1985, Laurie M., age 17, and Jeanine G., age 16, came to look at the mansion. Jeanine asked if they could tour the place, and defendant agreed on condition the young women park their car where it could not be seen. He took them on a tour, and commented that sometimes guards received sexual favors in exchange for tours. As the tour concluded, defendant said that police dogs had arrived, and that they should hide or he would lose his job. He led them to a safe in the basement. The young women begged not to be hidden there, but defendant assured them he would not close the door. Once the two were inside, he did close the door. After about five minutes, they heard him again, calling out Laurie's name in a teasing, sing-song voice. Defendant announced he would let the young women out only if they agreed to remove their clothes. He directed them to throw out their clothes as he opened the safe, then he handcuffed their hands behind their backs as they emerged in their underwear. He had a large knife in his hands, and told them they would have to "fool around" with him for five minutes, then he would release them.

He took them to a workroom where a rope was already connected to the leg of a bench. He tied the rope to Laurie's handcuffs. He led Jeanine away, and Laurie heard her scream. Defendant and Jeanine returned after about 15 minutes. She was dressed, and appeared frightened. Her lips and face were purple, possibly with cold, and the back of defendant's pants was dusty. Defendant gave his coat to Jeanine, tied her to the workbench, and then led Laurie to a kitchen. He had a knife on a table nearby and a club hanging from his belt. He ordered Laurie to remove her underclothing, and directed her to "kiss me and like it." She tried, but was unable to comply. Defendant told her to get on her knees, and to unbuckle his pants. He told her to "play with him" and "suck him." She touched her mouth to his penis and gagged, and said she could not do it. He directed her to "play with him," and she manually manipulated him until he ejaculated. He asked to "come inside" and she refused. He told her to get dressed, and said he would let both of them go, but would kill them if they told anyone what had happened.

Defendant walked with the two young women to a door near the safe, saying he would let them go. Jeanine said she wanted to go first because she had the keys to the car. Defendant handcuffed Laurie to the door, and left

with Jeanine. Laurie heard bumping and running noises, and the two ran back to her, defendant gripping the young woman's arm. Defendant told Jeanine to wait there. She was fearful and told Laurie that defendant had hit her with the club. Defendant returned and led Jeanine away. There were more bumping noises, and the sound of Jeanine's screams lasted for 15 minutes. Then there was a dragging sound.

Defendant returned for Laurie and pulled her toward a dark hallway. She resisted, and he stabbed her in the abdomen. She fell, and they struggled. He stabbed her 35 times, and hit her with his club. He left momentarily and returned with a carpet, into which he rolled her. He dragged her out of the mansion and put her in the trunk of his car, where Jeanine already was, bloody, with her hands tied behind her back. Laurie thought they remained in the trunk for two hours before the car moved.

During the period of this ordeal in the mansion, a police officer who was acquainted with defendant arrived at the mansion to discuss defendant's purchase of a citizens band radio. He found the gates wired shut, a circumstance he had never seen before in his patrol of the area. The front door of the mansion was locked. The officer sounded defendant's car horn. Two or three minutes later defendant appeared. He agreed to pay a deposit for the radio, but appeared very nervous and did not want to talk.

Defendant's shift ended at 4 p.m. His supervisor arrived at the mansion at 5:15, and defendant told him he could not fill in for his tardy relief any longer, as he had an appointment with his father at 6 p.m.

Laurie testified that the two women journeyed in the trunk of defendant's car for an hour or so. They arrived in the garage of the home defendant shared with his father and sister, and defendant opened the trunk. He rubbed Laurie's arm, and granted her request to get out to stretch her legs. He did the same for Jeanine. When they complained of the cold, he gave them a sleeping bag or blanket. He cleaned the blood from the trunk. Laurie tried to converse with him, but he was unresponsive. She asked what he would do with them, but received no reply. She asked to be taken to a hospital, and said she would never tell who had injured them. He gave her what she described as a "death stare," a look of hatred. Defendant went out and returned with a rifle, which he pointed at Laurie, commenting that if she were not silent, his friend "Bob" would have to kill her.

There were sounds of voices, and defendant hurriedly threw the young women back in the trunk and told them "Bob" had arrived, and they should be quiet and he would try to convince "Bob" not to kill them.

From the point of view of the other residents of the home, the evening was ordinary. Defendant emerged from the garage a little after 7 p.m., and refused dinner on the ground that he wasn't feeling well. He joined his sister in watching television, and in a game of Monopoly that lasted until about 11 p.m. He commented to his father, who returned home after midnight, that he had cleaned out the garage. Some friends drove up to show him their new car stereo. He sat with them in their car, complaining he had eaten a bad doughnut and was not feeling well. He moved his car from the garage to a spot across the street.

During the night, Laurie awoke to find the car moving. Defendant stopped the car several times, even opening the trunk once. Laurie asked if he had taken them to a lake, and defendant said, "No, but it's close enough." Then he beat her around the head and neck with his club 10 or 11 times. He threw her, still tied bound, down a ravine. He kicked her further down the ravine, saying, "here, be with your friend." She rolled down next to Jeanine. At daylight, Laurie crawled up the hill and flagged down help. One of her rescuers thought of applying first aid, but found her wounds too numerous and severe. One of the men, Mr. Masinter, reported that as he crouched near Jeanine, they could hear onlookers mention the word rape. She became distraught, explaining that defendant had not raped them, but had made them take off their clothes and "fool around" with him.

Emergency room treatment was ineffective for Jeanine: she bled to death from her many wounds and died on an operating table. An autopsy disclosed 41 stab wounds and a skull fracture. One treating doctor was of the opinion that a laceration to Jeanine's neck may have caused air to be aspirated into the blood vessels. He stated the cause of death as bleeding and exposure. Laurie suffered a punctured abdomen and lacerations to the head, chest and thighs, as well as contusions to the head.

### 2. *Defense Case*

Defendant presented evidence that he was not the only security guard at Carolands mansion who gave unauthorized tours to young people, and he also presented evidence that his own tours sometimes included boys.

He also presented the testimony of a physician, expert in treatment of shock, who was of the opinion that Jeanine had received improper care in the emergency room, that she had a 70 percent chance of survival when she was admitted, and that if she had been treated better for hypothermia she might well have survived. He was of the opinion that the treating physician was confused and "in over his head."

### B. *Penalty Phase*

#### 1. *Prosecution Case*

At the retrial of the penalty phase, in addition to offering evidence regarding the charged crimes, the prosecution presented evidence of three incidents that had occurred when defendant was a teenager. Two witnesses alleged that he had committed lewd acts with them when they were small children, and another recounted an incident in which defendant had locked her in a camper and made her undress while he took photographs of her and another child.

There was also evidence that defendant's parents assured neighbors who complained about these incidents that defendant would receive psychiatric treatment. After three appointments, defendant's father called off the treatment, saying there was no need for it.

Laurie also testified that she still had a useless finger that defendant had fractured, and that she had a scar on her head and was dizzy at times. She said defendant never expressed any remorse to her.

#### 2. *Defense Case*

Several young people testified regarding uneventful tours defendant had given them of the Carolands mansion, and one testified about another security guard who had frightened her and invited her and her group to return for an evening to "party."

Paramedics testified that both women were conscious and alert when they were rescued, and that in fact, Jeanine's blood pressure was better than that of Laurie.

Two women testified that defendant was kind to women and protective of them, that he was never angry or crude, but always gentle. They said he was a caring, quiet, lonely person.

Defendant's sister testified that defendant's mother was an alcoholic who had been emotionally and physically abusive to him. Defendant's father confirmed this. A police officer testified that defendant had cooperated with the police and admitted culpability voluntarily. A tape of defendant's statement to the police was played, and it revealed how distraught defendant was at what he had done.

Defendant had no prior misdemeanor or felony convictions.

### 3. *Rebuttal*

The prosecutor called several witnesses in rebuttal who testified that defendant pestered women, followed them home, and pressed unwanted attention on them. There was also evidence that he had the school transcripts of several classmates from high school. In addition, a former neighbor of defendant's family testified that she thought defendant had good parents and that she did not believe his mother was a heavy drinker.

Defendant's mother testified that she was never violent or verbally abusive with her children, that she was not an alcoholic, and that defendant's father and sister were liars.

Another witness said she was friendly with defendant, and that after his arrest he said he could not remember what happened, that another person was involved, and that he would plead insanity and be out of jail in six months. He told her that Jeanine and Laurie brought up sex, and that he then "went crazy." He later said he knew he had committed the crime, that he wanted to kill himself and that he believed he must have been crazy to have committed the crime.

## II. DISCUSSION

### A. *Issues Affecting the Trial of Guilt*

#### 1. *Sufficiency of the Evidence*

##### a. *Murder*

The prosecution proceeded upon alternate theories that the murder of Jeanine was premeditated and that it was a torture murder. According to defendant, neither theory was proved.

Having reviewed the entire record in the light most favorable to respondent, we conclude that a rational trier of fact could have found the essential elements of each theory of first degree murder beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

 We determine whether there was evidence of planning, motive or method that demonstrates a premeditated murder. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942]; see also *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1237 [278 Cal.Rptr. 640, 805 P.2d 899];

*People* v. *Hernandez* (1988) 47 Cal.3d 315, 349-350 [253 Cal.Rptr. 199, 763 P.2d 1289].) ■ Typically we sustain verdicts of first degree murder when there is evidence of planning, motive and method; when evidence of all three types is not present, we require "either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing." (*People* v. *Pensinger, supra,* 52 Cal.3d at p. 1237; see also *People* v. *Edwards* (1991) 54 Cal.3d 787, 813-814 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

■ Our review of the record discloses evidence of all three types. With respect to evidence of planning, the record reveals that days before the killing defendant remarked to Ms. Klatt that it would be possible to kill someone in the basement of Carolands mansion and "no one would ever know." His experiments with other young girls who visited the mansion informed him that the safe was quite soundproof. He was supplied with rope, handcuffs and the murder weapon when he removed his victims from the safe, and when he took them from the safe into an adjoining room, Laurie noticed that there was a rope already tied to the bench, ready for her bondage.

Even more important, in our view, is the evidence of defendant's conduct after he had taken the young women to his home. Defendant had many hours in which to contemplate and plan while his victims bled. His threat that "Bob" might kill them could be understood to refer to his own plans. His journey to dispose of his victims' bodies included several stops which the jury could infer were to allow him to select the most remote spot where the young women would not be rescued and subsequently identify him. His plan did not include any result but death; when Laurie begged to be taken to a hospital, he gave what she called "the death stare."

A rational trier of fact could readily conclude that defendant's motive for the killing was to avoid detection for the sexual offenses he committed against Laurie and Jeanine. (See *People* v. *Hernandez, supra,* 47 Cal.3d at p. 350; *People* v. *Haskett* (1982) 30 Cal.3d 841, 850 [180 Cal.Rptr. 640, 640 P.2d 776].)

Defendant claims that the manner of the killing did not show premeditation. He argues that the stab wounds were not such that would necessarily cause death, that he cared for the two women while he had them in his garage, and that when he dumped them down the ravine, they were still alive. He explains the knife attack as an explosion of violence that was a " 'mere unconsidered or rash impulse hastily executed.' " (*People* v. *Anderson, supra,* 70 Cal.2d at p. 27.)

The evidence supports a contrary conclusion. There was no evidence that the victims provoked defendant (compare *People* v. *Miller* (1990) 50 Cal.3d 954, 993 [269 Cal.Rptr. 492, 790 P.2d 1289]). A rational trier of fact could reject the "rash impulse" theory upon receiving evidence that after he attacked her defendant rolled Jeanine up in a rug, deposited her in the trunk of his car, and returned to inflict his second quarter-of-an-hour knife attack of the day. Evidence regarding the second attack tends to contradict the argument that the first attack was an unconsidered explosion of violence.

Even if we were to agree that it could only be concluded the many stab wounds defendant inflicted on each woman were part of an unreflective explosion of violence, his calculated decision to let them bleed for the next 18 hours, to refuse medical attention, to beat them about the head and to dump them on a winter night into an isolated ravine supports the conclusion that he premeditated the death of Jeanine. (See *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1023-1024 [248 Cal.Rptr. 568, 755 P.2d 1017] [premeditated murder when defendant knowingly permitted victim to bleed to death as he kept her captive in car].)

█ There is also sufficient evidence to support a conclusion that defendant killed with the intent to torture. █ "Torture murder is 'murder committed with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain.' " (*People* v. *Pensinger, supra,* 52 Cal.3d at p. 1239, quoting *People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].) The culpable intent is one to cause pain for " 'the purpose of revenge, extortion, persuasion or for any other sadistic purpose.' " (*People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881]; see also *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1101 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861].)

The intent to inflict extreme and prolonged pain may be inferred from the circumstances of the crime. (*People* v. *Morales* (1989) 48 Cal.3d 527, 559 [257 Cal.Rptr. 64, 770 P.2d 244].) On the other hand, "we have cautioned against giving undue weight to the severity of the victim's wounds, as horrible wounds may be as consistent with a killing in the heat of passion, in an 'explosion of violence,' as with the intent to inflict cruel suffering." (*People* v. *Pensinger, supra,* 52 Cal.3d at p. 1239.)

█ Defendant argues that he inflicted only three serious stab wounds on Jeanine, and that they were not of a nature to cause death if left untreated. He argues that he inflicted the stab wounds in an unconsidered explosion of violence, not in a premeditated effort to cause cruel suffering. He also argues

that far from intending to cause pain, he offered comfort to his victims. He points out that he allowed them to leave their underwear on when they complained of cold, lent Jeanine his jacket, was forbearing in his sexual requests, let them stretch their legs after several hours in the trunk of his car, and gave them sleeping bags when he threw them into the ravine.

We are well aware that the definition of torture murder requires proof of intent to cause pain and suffering beyond the pain of death. (*People* v. *Steger, supra,* 16 Cal.3d at pp. 543-544.) Here, during a 15-minute attack, defendant inflicted 41 knife wounds on Jeanine, while she screamed. He also inflicted a crushing blow to her skull. The jury could reasonably conclude that this series of painful injuries was calculated to cause grievous, prolonged pain. (*People* v. *Hindmarsh* (1986) 185 Cal.App.3d 334, 349 [229 Cal.Rptr. 640].) Defendant points to no evidence that Jeanine offered resistance or provocation and there was no evidence of intoxication. Thus the claim that the attack was an unpremeditated explosion of violence is unpersuasive.

We are satisfied, as we have said above, that even if a reasonable jury were to regard defendant's knife attack on his victims as an explosion of violence, his treatment of the two women after that attack demonstrates the intent to cause severe and prolonged pain. He closed them into the trunk of his car for hours, wrapped in rugs and bleeding from multiple wounds. Jeanine was bound as well as confined. He knew that their condition was desperate: he had cleaned the blood from his car trunk and refused with ire Laurie's request that they be taken to a hospital. He forced them to reenter the trunk, and kept them there, again for hours. He beat Laurie again and tossed both girls down a remote ravine on a winter night. The circumstantial evidence speaks not of a momentary impulse, but of an intentional infliction over many hours of grievous pain: the pain of close confinement, of loss of hope with loss of blood, of wounds left untreated and of exposure to the elements. We conclude a reasonable trier of fact could find that degree of calculated deliberation required to sustain a first degree murder verdict on a torture-murder theory.

### b. *Oral Copulation*

▮ Defendant argues there was insufficient evidence to sustain the conviction for attempted oral copulation of Jeanine. Again, it is our obligation to review the entire record, and drawing all reasonable inferences in favor of respondent, to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People* v. *Johnson, supra,* 26 Cal.3d at p. 576.) We conclude the evidence on this count is insufficient.

Section 288a provides that oral copulation "is the act of copulating the mouth of one person with the sexual organ . . . of another" and is a felony when "the act is accomplished against the victim's will by means of force, violence, duress, menace or fear of immediate and unlawful bodily injury . . . ."

Laurie testified that defendant told them he would not let them out of the safe where he had them confined unless they took off their clothes. He said the two young women would have to "fool around" with him for five minutes and then he would let them go. He handcuffed them both and took Jeanine away. Laurie heard a scream. Fifteen minutes later, defendant returned with Jeanine, whose face and lips were purple, apparently with cold, and who appeared frightened. Defendant had his jacket off and the seat of his pants was dusty. He took Laurie into another room, armed with the knife, and instructed her to kiss him. Then he directed her to unzip his pants and orally copulate him. She touched her mouth to his penis and gagged; thereupon he directed her to manipulate his penis manually until he ejaculated.

There was further evidence that defendant had sexually assaulted Jeanine. One of her rescuers, Michael Masinter, testified that when the dying young woman heard male voices on the road saying she had been raped, she cried for several minutes, saying that she did not want anyone to know that she had been raped. She explained through her tears that she "hadn't really been raped. That he made them take off their clothes and fooled around with them."

There is thus clear and substantial evidence of a forcible sexual attack of some kind on Jeanine and of a forcible oral copulation on Laurie. However, there is no evidence of the particular nature of the sexual assault on Jeanine, apart from an inference that because defendant committed a forcible oral copulation against Laurie, he may have attempted to do the same against her companion. Respondent argues that defendant told the young women they would have to "fool around" with him, and that he committed an act of forcible oral copulation against Laurie. From this evidence respondent infers that to defendant, "fool around" meant oral copulation. Finally, respondent would have us infer that when Jeanine told her rescuer defendant had made the women "fool around" with him, the term must have meant the same to her as respondent would have us infer it meant to defendant.

We find these layers of inference far too speculative to support the conviction of this count. Oral copulation was not the only sexual activity defendant had in mind with his second victim; "fooling around" seemed to

mean several things to him. It is also speculative to conclude that Jeanine would use the term in the same restricted sense respondent claims defendant intended to convey. ■ "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " (*People* v. *Morris* (1988) 46 Cal.3d 1, 21 [249 Cal.Rptr. 119, 756 P.2d 843].)

Evidence is sufficient to support a conviction only if it is substantial, that is, if it " 'reasonably inspires confidence' " (*People* v. *Morris, supra,* 46 Cal.3d at p. 19), and is "credible and of solid value." (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468], see also *People* v. *Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009].) ■ We conclude, considering the record as a whole, that it is speculative to infer because defendant committed an oral copulation on one victim, he necessarily attempted the same crime on another victim. This inference does not appear to us of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt that defendant perpetrated an attempted oral copulation, as opposed to any other forcible sexual assault, against Jeanine. It is significant, in this connection, that the jury found not true the charged special circumstance allegation that the murder occurred in the commission or attempted commission of oral copulation.

■ Defendant may be understood to claim that the reversal of the conviction for attempted oral copulation requires reversal of the entire guilt verdict because "the unreliable nature of the evidence undermines the deliberations as to guilt . . . ." We reject the claim. Our conclusion that the evidence was insufficient does not mean that the evidence itself was inadmissible or inherently unreliable. Our conclusion simply is that the evidence, which was independently admissible as relevant to the question of defendant's guilt for the other charged crimes, was not of sufficient substance to support the verdict on this count. Defendant propounds no theory under which the jury would have been influenced by the attempted oral copulation verdict in reaching a verdict as to any other count. Under the circumstances, it is not reasonably probable that in the absence of the error, the result would have been more favorable to defendant. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

2. *Other Evidentiary Claims*

a. *Admissibility of Statement of Jeanine*

As we have already noted, the court admitted into evidence the testimony of Michael Masinter recounting statements of Jeanine regarding the sexual

nature of defendant's attack on her. Masinter stayed with her in the ravine after medical help had been summoned. As they waited, they heard bystanders say something about a rape having been perpetrated. The witness said Jeanine became upset and immediately "broke down" and started to cry. She said she didn't want anyone to know that she had been raped. He left her to tell the bystanders to be quiet. She continued to cry for about five minutes. She regained her composure somewhat, and volunteered that "she hadn't really been raped. That he made them take off their clothes and fooled around with them." He told her not to worry about it and tried to calm her.

Defendant renews the objections made below that the statements of Jeanine were inadmissible hearsay and that they were subject to exclusion under Evidence Code section 352 as more prejudicial than probative. He argues for the first time that the admission of this evidence violated his state and federal constitutional rights to due process and to confront the witnesses against him. We reject the constitutional arguments because no objection on these grounds was raised below. ■ It is "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; see also *People* v. *Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330] [objection on basis of Evid. Code, § 352, does not preserve constitutional objection]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1240, fn. 2 [270 Cal.Rptr. 451, 792 P.2d 251] [objection on basis of Evid. Code, § 1101, does not preserve constitutional objection].) We observe on the merits, however, that we have rejected similar arguments in *People* v. *Farmer* (1989) 47 Cal.3d 888, 905-906 [254 Cal.Rptr. 508, 765 P.2d 940]. (See also *People* v. *Gallego* (1990) 52 Cal.3d 115, 176 [276 Cal.Rptr. 679, 802 P.2d 169].)

■ Evidence Code section 1240 provides for the admission into evidence of the spontaneous utterances of unavailable declarants: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

A spontaneous statement is one made without deliberation or reflection. (*People* v. *Farmer, supra,* 47 Cal.3d at p. 903.) "The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may

be important, but solely as an indicator of the mental state of the declarant." (*Id.* at pp. 903-904.)

■ Defendant argues the statements do not meet the first requirement of Evidence Code section 1240 because they did not narrate or describe any act, condition or event that was relevant to the prosecution's case. We disagree. The statements described in colloquial terms a sexual assault. Idiomatic and idiosyncratic language may meet the requirements of the section. (*People* v. *Stewart* (1986) 181 Cal.App.3d 300, 308-309 [226 Cal.Rptr. 252] [defendant said to have "messed with" teenager "on the top and bottom"]); *People* v. *Orduno* (1978) 80 Cal.App.3d 738, 742 [145 Cal.Rptr. 806] [defendant said by child victim to have "wet my pants"]; *People* v. *Butler* (1967) 249 Cal.App.2d 799, 803 [57 Cal.Rptr. 798] [defendant said to have "played nasties" with children].) These statements are not unreliable; a jury is equipped to interpret the imprecise language of everyday life.

■ Defendant also argues that the lapse of time between the sexual assault and the statements shows that the statements were not spontaneous. He argues that Jeanine must have reflected on her statements, because first she said she did not want anyone to know that she was raped, then corrected that statement by saying she was not raped, but that defendant "fooled around with them." Defendant relies on the following language: "Evidence Code section 1240 requires such statements be made while declarant is still 'under the stress of excitement caused by' the exciting event . . . . This requirement has been construed to introduce a very tight time limitation on out-of-court declarations which parties seek to qualify as 'spontaneous exclamations.' . . . [N]othing in the cases or the underlying theory of the 'spontaneous exclamation' exception would suggest the necessary level of psychological stress could be sustained for even a few hours . . . ." (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1130 [200 Cal.Rptr. 789].)

We cannot agree that under these circumstances the lapse of time alone deprived Jeanine's statement of spontaneity. Contrary to the suggestion of the court in *In re Cheryl H., supra,* 153 Cal.App.3d 1098, 1130, that a statement cannot be considered spontaneous if more than a few minutes have elapsed, "[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance." (*People* v. *Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541].)

The statements at issue here were made by a young woman who had been bleeding for 18 hours, who had suffered a traumatic head injury, and who

was not far from death. In addition, the evidence suggests she was unconscious for part of this period. Although the sexual attack of which she spoke had occurred some hours before her statements, her physical condition was such as would inhibit deliberation. (Compare *People v. Washington, supra,* 71 Cal.2d at p. 1177 [responses of hospital patient who had been unconscious, had brain damage and trouble breathing were spontaneous, though over an hour after attack]; see also *People v. Francis* (1982) 129 Cal.App.3d 241, 254 [180 Cal.Rptr. 873].) In fact, the evidence suggests she was in shock from the head injury, exposure to the elements and excessive bleeding. Furthermore, her statements were volunteered under the influence of an overwhelming emotion elicited by the thought that strangers had heard of the sexual nature of the attack. (Compare *People v. Panky* (1978) 82 Cal.App.3d 772, 778-779 [147 Cal.Rptr. 341] [spontaneous statement triggered by emotion aroused when victim saw her unknown assailant walking down street three weeks after rape].) It is undisputed that she was distraught when she made the statements. As in *People v. Farmer, supra,* 47 Cal.3d at page 904, there is no doubt Jeanine was in mental agony and in severe pain, that she was in no condition to fabricate, and that her statements were in no way self-serving.

We conclude the trial court did not abuse its discretion in admitting the statements of Jeanine. (*People v. Gallego, supra,* 52 Cal.3d at p. 175; *People v. Poggi* (1988) 45 Cal.3d 306, 317-320 [246 Cal.Rptr. 886, 753 P.2d 1082].)

 Defendant renews his argument that the evidence was more prejudicial than probative, and should have been excluded under Evidence Code section 352. That section vests in the court the discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice . . . ." We find no abuse of discretion in the trial court's rejection of this argument. (*People v. Benson, supra,* 52 Cal.3d at p. 786.)

The statements were probative on the contested issues of the charged sexual assaults against Jeanine, and to corroborate Laurie's testimony. The statements were not unduly prejudicial in light of the other evidence of defendant's sexual motivation. If anything the evidence was cumulative; Laurie testified that defendant told the two women they would have to "fool around" with him, and that he had sexually assaulted her. In addition, Laurie testified that Jeanine was the first to be led away, handcuffed and clad in her underwear; it is difficult not to infer that defendant proposed to "fool around" with her.

We also reject defendant's claim that the trial court failed to state on the record the reasons for denying defendant's motion under Evidence Code

section 352. The court, having heard lengthy argument on the point, explicitly stated that it was rejecting the Evidence Code section 352 claim. The record suffices to show that the court weighed the probative value of the evidence against its prejudicial effect. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84].)

### b. *Photograph of Victim in Life and Testimony of Her Father*

Defendant contends that a photograph of Jeanine in life and the testimony of her father identifying the photograph were improperly admitted because their prejudicial effect outweighed their probative value under Evidence Code section 352 and because they were irrelevant. Respondent argues that defendant's *in limine* motion did not preserve the issue for appeal because counsel failed to press the court for a ruling on the question of the father's testimony, failed to object at the time of the witness's actual testimony, and indeed offered to stipulate to the admission of the photograph if the father's testimony could be avoided. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 680 [276 Cal.Rptr. 788, 802 P.2d 278]; *People* v. *Hayes* (1990) 52 Cal.3d 577, 619 [276 Cal.Rptr. 874, 802 P.2d 376].)

Defense counsel and the prosecutor raised the issue of the admissibility of this evidence four times in the trial court, and there was a tentative ruling, at least as to the photograph, after a significant amount of discussion. No stipulation was ever entered. The court did not make any ruling on the record, tentative or otherwise, regarding the admissibility of the father's testimony, nor did defense counsel object to that testimony when it was actually offered.

If we take defendant's efforts to secure a ruling on the motion to exclude the photograph as adequate to preserve the issue for appeal, we still reject the claim. The court's decision will not be overturned on appeal unless an abuse of discretion appears. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 817.) The trial court apparently agreed with the prosecutor that the appearance of Jeanine in life was relevant to the prosecutor's burden of proving a forcible sex offense against her. We doubt whether the victim's personal appearance was of much relevance to prove this crime. (Compare *People* v. *Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516].) Nevertheless, there was nothing inflammatory about the picture. It showed Jeanine by herself, in a natural pose, with the background trimmed away. (Compare *People* v. *Thompson* (1988) 45 Cal.3d 86, 115 [246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Kimble* (1988) 44 Cal.3d 480, 499 [275 Cal.Rptr. 160, 800 P.2d 516].) As in *People* v. *Kelly, supra,* 51 Cal.3d 931, 963, given the state of the evidence against defendant, any error must be deemed harmless. (See

also *People* v. *Anderson* (1990) 52 Cal.3d 453, 475-476 [276 Cal.Rptr. 356, 801 P.2d 1107].)

Defense counsel did not object to Jeanine's father's testimony when it was actually offered, and the issue may be deemed waived for that reason. (*People* v. *Kaurish, supra*, 52 Cal.3d at p. 680.) ▮ On the merits, although we have said that the testimony of the parent of a murder victim may not be relevant if there is an offer to stipulate to the facts to be established by such testimony (see *People* v. *Bonin* (1989) 47 Cal.3d 808, 848-849 [254 Cal.Rptr. 298, 765 P.2d 460]), we see no reasonable probability of prejudice here. The father's testimony consisted of factual answers to four questions posed by the prosecutor. There was no emotional outburst. (Compare *People* v. *Pinholster* (1992) 1 Cal.4th 865, 959 [4 Cal.Rptr.2d 765, 824 P.2d 571].) The testimony "had no potential to inflame the jurors and hence could not have exposed defendant to prejudice." (*People* v. *Bonin, supra*, 47 Cal.3d at p. 849.)

Defendant claims again that the court failed to express its reasoning on this evidentiary point on the record. We do not require any particular form of words, and it is clear from the record that the court fully considered the matter of the photograph. (*People* v. *Edwards, supra*, 54 Cal.3d at p. 817.) The court's failure to record its reasoning on the question of the admissibility of the father's testimony may be attributed to defense counsel's failure to object to that testimony when it was admitted.

Finally, defendant contends that the admission of the photograph and of the father's testimony violated the Eighth Amendment of the United States Constitution by undermining the reliability of the guilt and penalty determinations. We have found no inflammatory matter that would have made the guilt determination unreliable. As respondent points out, the evidence was not presented at the second penalty trial, so it can have had no effect on the penalty determination.

### c. *Other Photographs*

Defendant renews his claim that five photographs were erroneously admitted into evidence despite his objection that they were irrelevant and more prejudicial than probative. (Evid. Code, § 352.)

▮ The court did not abuse its broad discretion in admitting the photographs. (*People* v. *Wright* (1990) 52 Cal.3d 367, 434 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 776 [251 Cal.Rptr. 83, 759 P.2d 1260].) Exhibits 3 and 11, depicting the two young

women in the ravine, were relevant to indicate the condition of the victims when they were found, evidence that was relevant to show malice and intent to cause cruel suffering. (*People* v. *Kelly, supra,* 51 Cal.3d at p. 963; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 644 [244 Cal.Rptr. 181, 749 P.2d 836].) The photographs are not gruesome. Exhibit 10, Roy Cranford in the ravine, and exhibit 15, the ravine without occupants, were relevant to illustrate the remoteness of the spot, and to corroborate Laurie's description of the scene. (*People* v. *Gallego, supra,* 52 Cal.3d at pp. 196-197 [photographs relevant to show perpetrator left bodies where it was unlikely they would be discovered].)

Exhibit 21 revealed a long piece of cord in a dresser drawer in defendant's bedroom. There was testimony that the cord used to tie the young women was of the same type; the evidence was relevant to support an inference of premeditation on the theory that defendant took part of his supply of cord with him to work on the day of the crimes.

Contrary to defendant's claim, such evidence is not cumulative: "The prosecution was not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory . . . ." (*People* v. *Turner* (1990) 50 Cal.3d 668, 706 [268 Cal.Rptr. 706, 789 P.2d 887]; accord *People* v. *Kelly, supra,* 51 Cal.3d at p. 963; *People* v. *Melton* (1988) 44 Cal.3d 713, 741 [244 Cal.Rptr. 867, 750 P.2d 741].) Nor do we find the photographs inflammatory. They are quite large, but they are not gruesome. (See *People* v. *Kelly, supra,* 51 Cal.3d at p. 963, and cases cited.) Finally, we reject the claim that the court failed to weigh the probative value of the photographs against their prejudicial effect. The court heard argument on the matter and clearly was made aware of defendant's contention regarding the arguable prejudicial potential of such evidence. This record is adequate for meaningful appellate review of the point. (*People* v. *Mickey, supra,* 54 Cal.3d at p. 656.)

### B. *Special Circumstance Issues*

#### 1. *Torture-murder Special Circumstance*

Defendant asserts that standard jury instructions defining first degree murder by torture and the torture-murder special circumstance violated the Eighth and Fourteenth Amendments of the United States Constitution and article I, sections 7 and 17 of the California Constitution because they used the term "sadistic purpose." Relying on *Godfrey* v. *Georgia* (1980) 446 U.S. 420, 428 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759], and *Maynard* v.

*Cartwright* (1988) 486 U.S. 356, 361 [100 L.Ed.2d 372, 380, 108 S.Ct. 1853], he maintains that the instructions failed to channel the jury's sentencing discretion or give meaningful guidance in the sentencing choice, because the term "sadistic purpose" could be understood to include any murder. He also argues that the phrase is simply too vague to provide any guidance.

The trial court instructed the jury pursuant to CALJIC No. 8.24, which provides in pertinent part that first degree murder by torture is committed "with a wilful, deliberate, premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion or *for any sadistic purpose.*" (Italics added.)[2]

The court also instructed the jury on the torture-murder special circumstance pursuant to CALJIC No. 8.81.18, which provides: "To find that the special circumstance, referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved: [¶] 1. The defendant intended to kill or intended to aid in the killing of a human being; [¶] 2. The defendant intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or *for any sadistic purpose,* and [¶] 3. The defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture." (Italics added.)[3]

■ The torture-murder special circumstance is, of course, only constitutional to the extent it channels and limits the jury's sentencing discretion, minimizing the risk of a wholly arbitrary and capricious decision. (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 189, 206-207 [49 L.Ed.2d 859, 883-884, 893, 96 S.Ct. 2909].) When statutory language is too vague, and no limiting interpretation is supplied, it may be impossible to distinguish one case in which the death penalty is imposed from the many cases in which it is not. (See *Godfrey* v. *Georgia, supra,* 446 U.S 420, 427-428 [64 L.Ed.2d 398, 405-406].) However, we have found the torture-murder special circumstance to be consistent with these Eighth Amendment principles. (*People* v. *Wade*

---

[2]The definition of torture murder for the purpose of establishing a first degree murder is irrelevant to the task of defining that narrow class of crimes for which the death penalty is appropriate. Accordingly, we reject out of hand defendant's Eighth Amendment claim with respect to the instruction on first degree murder by torture. Defendant's claims that the court erred in instructing the jury that first degree murder by torture may be shown without proving intent to kill or the victim's awareness of suffering are also rejected on the basis of settled law. (*People* v. *Davenport, supra,* 41 Cal.3d at pp. 267, 271 [intent to kill unnecessary to torture-murder verdict]; *People* v. *Wiley, supra,* 18 Cal.3d at p. 173 [victim's awareness of pain not an element of first degree murder by torture].)

[3]The court modified the standard instruction only slightly, by substituting the name Jeanine G. for the phrase "a human being."

(1988) 44 Cal.3d 975, 993 [244 Cal.Rptr. 905, 750 P.2d 794]; *People* v. *Davenport, supra,* 41 Cal.3d at pp. 270-271.) " 'A murder by torture was and is considered among the most reprehensible types of murder *because of the calculated nature of the acts causing death . . . .' " (People* v. *Davenport, supra,* 41 Cal.3d 267.) " ' "[I]t is the state of mind of the torturer—the cold blooded intent to inflict pain for personal gain or satisfaction" ' which sets the torture murderer apart from others who kill with malice aforethought and makes murder by torture one of the most reprehensible crimes that may be committed." *(Id.* at pp. 269-270.)

 Defendant does not ask us to reconsider these decisions. Rather, he takes the position of attacking a single phrase of a jury instruction, arguing that the term "sadistic purpose" is so vague and overbroad that the jury was not adequately guided under the Eighth Amendment and the parallel state constitutional guaranty against cruel or unusual punishment.

Defendant's claims, whether they are based on the Eighth or Fourteenth Amendments, are judged by asking whether there is a reasonable likelihood the jury understood the charge as defendant asserts. *(Estelle* v. *McGuire* (1991) __ U.S. __, __ [116 L.Ed.2d 385, 399, fn. 4, 112 S.Ct. 475]; *People* v. *Benson, supra,* 52 Cal.3d at p. 801.) We determine how it is reasonably likely the jury understood the instruction, and whether the instruction, so understood, accurately reflects applicable law. *(People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218]; see also *People* v. *Kelly* (1992) 1 Cal.4th 495, 525-526 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

The special circumstance instruction given in this case is derived from our cases explaining the intent element of the statutory definition of torture murder. As we have already noted in connection with defendant's attack on the sufficiency of the evidence, in *People* v. *Steger, supra,* 16 Cal.3d 539, we defined torture murder as "murder committed with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain." *(Id.* at p. 546.) In an earlier case we explained: "In determining whether the murder was perpetrated by means of torture the solution must rest upon whether the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, *or to satisfy some other untoward propensity.*" *(People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51], italics added.) In *People* v. *Wiley, supra,* 18 Cal.3d 162, we approved the following statement of the purpose element of torture murder: " 'the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other *sadistic purpose.*' " *(Id.* at p. 168, italics added.)

We have consistently approved the language of the instructions given in this case as a correct statement of the law of California. *(People* v. *Bittaker,*

*supra,* 48 Cal.3d at pp. 1100-1101; *People* v. *Davenport, supra,* 41 Cal.3d at p. 267.) The instruction, including the phrase "sadistic purpose," has been approved as a *"precise* and correct statement of the law." (*People* v. *Talamantez* (1985) 169 Cal.App.3d 443, 455 [215 Cal.Rptr. 542], italics added.) We have used the expression "sadistic purpose" ourselves without requiring further definition. (*People* v. *Pensinger, supra,* 52 Cal.3d at p. 1239; *People* v. *Bittaker, supra,* 48 Cal.3d at p. 1101; *People* v. *Wiley, supra,* 18 Cal.3d at p. 168.)

The term "sadism" is defined as "love of cruelty, conceived as a manifestation of sexual desire" (Webster's New Internat. Dict. (2d ed. 1941) p. 2196), as "the infliction of pain upon a love object as a means of obtaining sexual release" (Webster's Third New Internat. Dict. (1981) p. 1997), as "the getting of sexual pleasure from dominating, mistreating, or hurting one's partner" (Webster's New World Dict. (2d college ed. 1974) p. 1253), and as "sexual gratification gained by causing pain or degradation to others." (Webster's College Dict. (1991) p. 1182). We do not believe, as defendant argues, that the term is so broad that it creates a category into which almost all murders could fall. Rather, it is a refinement of the intent element of torture murder, an element we have already said adequately distinguishes this type of crime from other murders for Eighth Amendment purposes.

The high court has declared that the Eighth Amendment does not commit us to a standard of "mathematical precision" in defining those factors that may be used to reach a sentence of death. (*Walton* v. *Arizona* (1990) 497 U.S. 639 [111 L.Ed.2d 511, 529, 110 S.Ct. 3047].) (Compare *Maynard* v. *Cartwright, supra,* 486 U.S. at p. 365 [100 L.Ed.2d at p. 382] [requirement that there be "some kind of torture or physical abuse" may adequately limit "heinous, atrocious, or cruel" aggravating circumstance].) Torture murder is particularly reprehensible because the defendant intends to cause cruel suffering—an intent that the jury was adequately informed may be induced by any number of nefarious purposes, including sadism.

Defendant also cites *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76], in support of his claim. In that case we declared that a statutory special circumstance for a murder that is "especially heinous, atrocious or cruel" was unconstitutionally vague as a matter of due process, not the Eighth Amendment to the federal Constitution. The constitutional rule applied was that against vaguely worded criminal *statutes,* that is, those statutes that are not definite enough to " 'provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply' " the statute. (*Id.* at p. 801, italics omitted, quoting *People* v. *McCaughan* (1957) 49

Cal.2d 409, 414 [317 P.2d 974].) A jury instruction obviously is not subject to scrutiny under this standard, as an instruction does not establish the elements of a crime, but merely attempts to explain a statutory definition. Of course an instruction may be so inadequate and confusing as to violate due process; but the consequence is not that the instruction is "void for vagueness." Rather, when it is argued the instruction is so vague and confusing as to violate fundamental ideas of fairness, "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle* v. *McGuire, supra,* __ U.S. at p. __ [116 L.Ed.2d at p. 399].)

The term "sadistic purpose" is not one that calls only for the sort of "sheer speculation," that would be unconstitutional under *Godfrey* v. *Georgia, supra,* 446 U.S. at page 429 [64 L.Ed.2d at pages 406-407], nor is it "difficult to assign any specific content to the pejoratives contained in [the instruction]." (*People* v. *Superior Court (Engert), supra,* 31 Cal.3d at p. 801.) It is a term in common usage, having a relatively precise meaning, that is, the infliction of pain on another person for the purpose of experiencing pleasure. This is the definition of the term offered by the district attorney in closing argument, and we are satisfied it is the definition that would be arrived at by a reasonable jury. We are unpersuaded that a reasonable jury would have understood or employed the term to so distort the entire charge that nearly any murder would constitute a torture murder.

Defendant makes much of the fact that after it began deliberating, the jury asked the court for the legal definition of "sadistic purpose." The court did not provide a definition. But there is no *legal* definition of the term.[4] The jurors' common understanding of the term was all that was required. "There is no need to instruct a jury on the meaning of terms in common usage, which are presumed to be within the understanding of persons of ordinary intelligence." (*People* v. *Ordonez* (1991) 226 Cal.App.3d 1207, 1229-1230 [277 Cal.Rptr. 382], and cases cited.)

Defendant also persists in claiming that the victim's awareness of pain is a necessary element of the torture-murder special circumstance. He is wrong. (*People* v. *Davenport, supra,* 41 Cal.3d at p. 271.)

---

[4] A law dictionary defines sadism in this manner: "Active algolagnia or the gratification of sexual desire by inflicting pain." (Bouvier's Law Dict. (1934) p. 1080.) Another law dictionary defines sadism as "That state of sexual perversion in man in which the sexual inclination manifests itself by the desire to beat, to maltreat, humiliate and even to kill the person for whom the passion is conceived." (Black's Law Dict. (3d ed. 1933) p. 1754.) More recently Black's (6th ed. 1990, p. 1336) simplified the definition to "A form of satisfaction, commonly sexual, derived from inflicting harm on another."

Because the instructions correctly stated the law in terms of common understanding, we conclude it is not reasonably likely the jury misunderstood the law regarding torture murder or the torture-murder special circumstance.

### 2. Kidnap-murder Special Circumstance

In *People* v. *Green, supra,* 27 Cal.3d at pages 61-62 (*Green*), we held that the felony-murder special circumstance is "inapplicable to cases in which the defendant intended to commit murder and only incidentally committed one of the specified felonies while doing so." (*People* v. *Clark* (1990) 50 Cal.3d 583, 608 [268 Cal.Rptr. 399, 789 P.2d 127].)

 Defendant argues that the kidnapping of Laurie and Jeanine was incidental to the latter's murder and had no felonious purpose independent of defendant's intent to kill, so that the kidnap-murder special circumstance is invalid under *Green, supra,* 27 Cal.3d 1. In support, he points to the prosecutor's argument to the jury that defendant had formed the intent to kill before the victims arrived at the mansion, and the evidence that defendant mentioned killing to a young woman who had taken one of his unauthorized tours of the mansion before this crime occurred.

We must examine the evidence in the light most favorable to the prosecution and decide whether a rational trier of fact could find beyond a reasonable doubt that defendant had a purpose for the kidnapping apart from murder. (*People* v. *Bonin, supra,* 47 Cal.3d 808 at p. 850.) We believe the evidence is sufficient to support the jury's finding. We are the more confident of our conclusion because the court instructed the jury in the terms of *Green, supra,* 27 Cal.3d 1.

The jury was not bound to accept the prosecutor's argument that defendant's plan from the beginning was to kill his victims. (*People* v. *Kimble* (1988) 44 Cal.3d 480, 502-503 [244 Cal.Rptr. 148, 749 P.2d 803].) This is not a case like *People* v. *Weidert* (1985) 39 Cal.3d 836 [218 Cal.Rptr. 57, 705 P.2d 380], in which it was overwhelmingly clear that the defendant formed a plan to kill a particular victim to prevent his testimony in a subsequent criminal proceeding, and that the kidnapping of the victim was wholly incidental to the planned murder. Nor is it a case like *Green, supra,* 27 Cal.3d 1, 62, in which the defendant's primary purpose was the murder of his wife, and his subsequent removal of her personal property to avoid her identification was purely incidental to the murder.

Rather, this case is more like *People* v. *Ainsworth, supra,* 45 Cal.3d 984, in which we explained: "*Green* and *Thompson* stand for the proposition that

when the underlying felony is *merely incidental* to the murder, the murder cannot be said to constitute a 'murder in the commission of' the felony and will not support a finding of felony-murder special circumstance." (*Id.* at p. 1026.) We concluded in *Ainsworth*, where defendant had kidnapped the victim, put her in his car, and let her bleed to death over a period of hours, that there was substantial evidence from which the jury could have determined that the kidnapping was not merely incidental to the murder.

In the instant case, defendant did not immediately dispose of his victims once he had them in the trunk of his car, but brought them to his home. He may have been undecided as to their fate at that point. It could reasonably be inferred that defendant formed the intent to kill after the asportation, so that the kidnaping could not be said to be merely incidental to the murder.

Defendant's suggestion that if the jury found he had any intent to kill at the time he kidnapped the victims there could be no kidnap-murder special circumstance is ill-founded. Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance (*People* v. *Clark, supra,* 50 Cal.3d at pp. 608-609.) It is when the underlying felony is merely incidental to a murder that we apply the rule of *Green, supra,* 27 Cal.3d 1.

■ We also reject defendant's claim that the instruction given the jury on this point was prejudicially inadequate. The instruction was delivered as follows: "If you find that the special circumstance referred to in these instructions as murder in the commission of kidnapping is true, it must be proved: [¶] 1. That the murder was committed while the defendant was engaged in the commission or attempted commission indicated; or [¶] 2. That the defendant specifically intended to take the life of Jeanine [G.]; and [¶] 3. That the murder was committed in order to carry out or advance the commission of the crime of kidnapping or to facilitate the escape therefrom or to avoid detection. [¶] In other words, the special circumstance referred to in these instructions is not established if the kidnapping was merely incidental to the commission of the crime."

Defendant claims the term "merely incidental" is ambiguous. We do not find it so; our court has used the term repeatedly in this context. (*People* v. *Ainsworth, supra,* 45 Cal.3d at p. 1026; *Green, supra,* 27 Cal.3d at p. 61; see also *People* v. *Clark, supra,* 50 Cal.3d at p. 608 ["simply incidental"].)

Defendant claims the court erred in using the disjunctive at the end of paragraph 1 of the instruction. The disjunctive is indeed inappropriate, but we are convinced the jury would understand that the disjunctive was not

intended when it heard—and later read—the last paragraph of the instruction. Further, the very next instruction read to the jury, on the oral copulation special circumstance, correctly omitted the disjunctive. The jury received a copy of the written instructions, which properly omitted the disjunctive. Finally, defendant's claim that the last paragraph is marred by the use of the term "crime" rather than "murder" is inconsequential. The jury would understand from the instruction as a whole that the crime referred to was murder. Again, the very next instruction read to the jury was the identical instruction relating to murder in the course of oral copulation, and the court correctly said "murder" rather than "crime" in the last paragraph. The written instructions also correctly used the term "murder." In sum, it is not reasonably likely the jury misunderstood the instruction as given.

### 3. Cumulative Error

Defendant contends that cumulative error at the guilt phase of trial requires reversal as a matter of due process. We have already examined the prejudicial impact of any errors in admitting a photograph of Jeanine in life, and in admitting her father's testimony, finding none. As noted above, the court's minor misstatements in the instruction on the kidnap-murder special circumstance would not have misled the jury. Finally, as we have explained, in light of all the evidence, the improper conviction for attempted oral copulation could have had no impact on the jury's consideration of defendant's guilt as to the other charged crimes. We find that the errors were harmless, whether viewed in isolation or in cumulation.

### C. Claims Affecting the Penalty Phase

#### 1. Jury Selection: Challenges for Cause

Defendant contends that the trial court erred during the selection of the second penalty phase jury by refusing to exclude three jurors for cause because of their bias in favor of the death penalty. He claims each juror's attitude clearly "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844].) We reject the claim.

Each of the jurors defendant now complains of was peremptorily challenged and did not serve at the penalty phase retrial. At the conclusion of voir dire, defendant had used only 18 of his 26 peremptory challenges. He offers no justification for his failure to exhaust his peremptory challenges, and he did not indicate any dissatisfaction with the jury when it was sworn.

Thus he cannot complain on appeal of any error in refusing to excuse the jurors for cause. (*People* v. *Kelly, supra,* 1 Cal.4th at p. 518; *People* v. *Morris* (1991) 53 Cal.3d 152, 184 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Gordon, supra,* 50 Cal.3d at p. 1247.) Defendant asks that we reconsider our view that failure to exhaust peremptory challenges demonstrates a lack of prejudice arising from an erroneous denial of a challenge for cause, relying on language in *Gray* v. *Mississippi* (1987) 481 U.S. 648 [95 L.Ed.2d 622, 107 S.Ct. 2045]. We recently rejected the same claim (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1247), relying on limiting language in *Ross* v. *Oklahoma* (1988) 487 U.S. 81, 87-88 [101 L.Ed.2d 80, 89-90, 108 S.Ct. 2273], and we decline the invitation to reconsider.

### 2. *Notice of Evidence in Aggravation*

On December 1, 1986, the prosecutor filed notice of intention to introduce evidence in aggravation. The notice stated that the prosecution would rely on the "nature and circumstances of the present offenses." At the conclusion of the trial, on May 15, 1987, the jury announced its inability to reach a verdict as to penalty, and a mistrial was declared. The date set for retrial of the penalty phase was January 11, 1988. On November 2, 1987, the prosecutor filed an amended notice of intention to introduce evidence in aggravation, announcing that the prosecution would rely not only on the circumstances of the charged crimes, but also on five other instances of criminal activity. On December 28, 1987, defendant moved to limit the prosecutor to the evidence referred to in the original notice. The motion was denied. Jury selection for the penalty phase retrial began on February 29, 1988.

■ Defendant contends the trial court erred in permitting the prosecution to amend the original notice of intention to produce evidence in aggravation. He argues that section 190.3 requires that notice of evidence to be presented in aggravation be given before the trial, defined as the commencement of the guilt phase of a capital trial, and that an amended notice given before the commencement of a penalty phase retrial is untimely. We have recently rejected this argument. (*People* v. *Thompson* (1990) 50 Cal.3d 134, 177-178 [266 Cal.Rptr. 309, 785 P.2d 857].) We said, in the context of a penalty phase retrial after the original jury had been unable to reach a verdict: " 'Where . . . the notice issue arises in the context of a second trial—i.e., a "retrial"—. . . "trial" must reasonably be construed to mean the judicial proceeding in which the matter in issue is again examined and resolved. . . . We conclude, therefore, that the "trial" to which former section 190.3 refers embraces the original trial . . . or the retrial, be it of the entire proceeding or the penalty phase only.' " (*Id.* at pp. 177-178.)

Defendant argues that his right to due process and to counsel at the guilt phase of trial were impaired. He claims that trial tactics at the guilt trial are

influenced by the evidence to be presented at the penalty trial. If a second penalty trial brings forth new evidence, the tactical decisions made at the guilt phase may be undermined. As we have interpreted the statute to mean that the commencement of a penalty retrial is the commencement of "trial" for the purpose of section 190.3, he is essentially arguing that the statute—or our interpretation of it—is unconstitutional.

While we acknowledge defendant's point that defense counsel should prepare for the guilt trial with the penalty trial in mind, counsel at the guilt trial did have this opportunity, and apparently put it to good use, as the jury could not reach a verdict as to penalty. Even after a mistrial of the penalty phase, however, the guilt verdict is stable. Tactical choices at the guilt trial can never be undone after the verdict, though tactics may change at a second penalty trial. Defendant's argument would require that no new evidence be presented at any penalty retrial; we see no evidence that our law intended such a result, nor does defendant explain why such a result is constitutionally required. Defendant's view of the meaning of the right to counsel as encompassing the right to rely on tactical choices made at a first trial at any retrial, would mean that no new evidence could be presented at *any* retrial after reversal of any criminal conviction or after any mistrial. This is not the law. "[T]he Government is not limited at a new trial to the evidence presented at the first trial, but is free to strengthen its case in any way it can by the introduction of new evidence." (*United States* v. *Shotwell Mfg. Co.* (1957) 355 U.S. 233, 243 [2 L.Ed.2d 234, 241, 78 S.Ct. 245].)

3. *Evidentiary Issues*

a. *Evidence of Juvenile Misconduct*

■■■ Defendant claims it was error to admit evidence of his illicit sexual encounters with minors when he was himself a minor. Defendant claims the evidence was inadmissible under our decision in *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], because his conduct did not constitute a crime of violence. He argues that there was insufficient evidence from which a reasonable jury could conclude that any crime of violence had been proven.

Section 190.3, factor (b) provides that the jury may take into account "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." In *People* v. *Boyd, supra*, 38 Cal.3d 762, 774, we said that evidence is admissible under factor (b) only if it is relevant to prove commission of a crime involving force or violence or an

express or implied threat to use force or violence. In *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-54 [188 Cal.Rptr. 77, 655 P.2d 279], we declared that the jury may not rely on evidence of such uncharged crimes of violence as an aggravating factor unless the crimes are proved beyond a reasonable doubt.[5]

Michele S. testified that when she was six and defendant, her next-door neighbor, was seventeen, he threatened her that "bad things" would happen to her unless she went into his house with him. Having thus induced her to enter the house, in the seclusion of a bedroom, he instructed her to take off her clothes and he did the same. Once their bodies were touching as they lay naked on a bed, he instructed her to touch his penis with her mouth, and when she demurred, he told her to kiss his neck.

This evidence sufficiently established the commission of a lewd act against a child, that is, a touching of the body of a child under the age of 14, with the specific intent of arousing, appealing to, or gratifying the lust of the child or the accused. (§ 288, subd. (a); *People* v. *Cicero* (1984) 157 Cal.App.3d 465, 472, 473 [204 Cal.Rptr. 582]; 2 Witkin & Epstein, Cal. Criminal Law (1988) §§ 786-790, pp. 889-894.) Touching of a sexual organ is not required. (See 2 Witkin & Epstein, *supra*, § 790, pp. 893-894.) Defendant's intent to arouse or be aroused is patent. For the purpose of admissibility under section 190.3, factor (b): " '[T]he "force" requisite . . . does not mean bodily harm but the physical power required in the circumstances to overcome [the victim's] resistance.' " (*People* v. *Jennings* (1988) 46 Cal.3d 963, 983 [251 Cal.Rptr. 278, 760 P.2d 475].) We have recognized inequality in size between the perpetrator and victim as an element of such physical power. (*Id.* at pp. 982-983.) Defendant's superior size and age, and the threat that "bad things" would happen unless Michele S. went into the house, would allow a reasonable juror to draw the inference that he had used an implied threat of force.

Tammy M. testified that when she was seven or eight, and defendant was fifteen or sixteen, defendant invited her and another young neighborhood child into his camper to show them something. When they were inside, he closed the door, and ordered them to take off all their clothes. He kept snapping a belt with a big buckle on it, and this frightened her. He said if they did not do what he said, or if they told anyone about it, he would hit them with the belt. He took a picture of them with their clothes off, but then someone pounded on the door and the children got dressed and ran off.

---

[5]The jury was specifically instructed on the elements of the crimes of committing a lewd act on a child and false imprisonment, and was told that they were relevant only if the crimes were proven beyond a reasonable doubt and if they involved express or implied use of force or violence, or the threat of force or violence.

We agree with respondent that the evidence was sufficient to support a finding of false imprisonment, as defendant clearly unlawfully violated the personal liberty of the children. (§ 236.) The evidence supports a finding that the false imprisonment was "effected by violence, [or] menace . . . " (§ 237); defendant threatened to beat the children with his belt if they failed to comply with his commands. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 579 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Arvanites* (1971) 17 Cal.App.3d 1052, 1059-1060 [95 Cal.Rptr. 493].) Again, his superior size and age add weight to the evidence that he used a threat of force against the much smaller children.

Tammy M. also testified that during the same period, she was watching television in defendant's house when he invited her to his bedroom to show her something. He shut the door and told her to undress from the waist down. He undressed as well. He took her hand and touched his penis with it. He wanted her to get on top of him, but then his mother came home. He pushed Tammy out the window, saying that if she said anything about the incident, he would beat her up.

The evidence clearly is sufficient to establish a lewd act on a child under section 288, subdivision (a), defining a lewd act without use of force or coercion. (§ 288, subd. (a); compare § 288, subd. (b) [forcible lewd act]; *People* v. *Burton* (1989) 48 Cal.3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270].)

Defendant may be correct to argue that the evidence was insufficient to support a conviction for a lewd act with force or coercion, as defined by section 288, subdivision (b). There was little or no evidence, apart from the fact of disparity in size and age, that defendant used force or violence beyond the force necessary to accomplish the lewd act. (*People* v. *Quinones* (1988) 202 Cal.App.3d 1154, 1158 [249 Cal.Rptr. 435]; *People* v. *Pitmon* (1985) 170 Cal.App.3d 38, 46 [216 Cal.Rptr. 221], see also *People* v. *Bergschneider* (1989) 211 Cal.App.3d 144, 154, fn. 8 [259 Cal.Rptr. 219] [threat of reprisal for reporting lewd act not enough].) Nonetheless, there was evidence that the entire continuous course of criminal conduct involved the threat of force or violence. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 840-841 [281 Cal.Rptr. 90, 809 P.2d 865].) When there was some sound indicating interruption by defendant's mother, defendant pushed Tammy M. out the bedroom window and warned that if she told anyone, he would beat her up. Thus the criminal activity as a whole involved an express threat of violence, within the meaning of section 190.3, factor (b).

We conclude that the evidence was sufficient to prove in each instance that defendant committed a crime involving violence or the threat of violence, so that the evidence was admissible and relevant under section 190.3 and our decision in *People* v. *Boyd, supra*, 38 Cal.3d 762, 774.

Defendant also argues that the admission of this evidence violated his right of due process because the jury was incapable of evaluating the evidence fairly, as it had already convicted him of murder. He is mistaken; the penalty phase jury was not the same jury that had convicted him at the guilt trial. His due process claims lacks merit, in any event. (*People* v. *Balderas* (1985) 41 Cal.3d. 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].)

Defendant also argues that it is a basic violation of due process and of the Eighth Amendment of the United States Constitution to admit evidence of other crimes at the penalty phase of a capital trial, particularly when the admission of such evidence permits the imposition of the death penalty on the basis of long-past crimes as to which the statute of limitations has run. We have rejected these claims in the past, and refuse to reconsider them. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 134-136 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Benson, supra,* 52 Cal.3d 754, 788-789; *People* v. *Frank* (1990) 51 Cal.3d 718, 729 [274 Cal.Rptr. 372, 798 P.2d 1215]; *People* v. *Balderas, supra,* 41 Cal.3d at pp. 204-206.)

Defendant next argues that the admission of evidence of juvenile misconduct violates the Eighth Amendment of the United States Constitution because it permits aggravation of sentence for the capital crime for conduct not considered criminal when it occurred. He relies on the high court's decision in *Thompson* v. *Oklahoma* (1988) 487 U.S. 815 [101 L.Ed.2d 702, 108 S.Ct. 2687]. In that case, the court held that the Eighth and Fourteenth Amendments of the United States Constitution prohibit execution for a crime committed when the defendant was under 16 years of age; a minor is not as responsible as an adult, and " 'punishment should be directly related to the personal culpability of the criminal defendant.' " (*Id.* at p. 834 [101 L.Ed.2d at p. 717].) Defendant's reliance on this case is misplaced. There, it was conduct committed when defendant was a minor that the state proposed to punish by death; here, it is conduct defendant committed as an adult that is to be punished by death. As we have explained before in rejecting a constitutional attack on the admission of evidence of juvenile misconduct, "the penalty verdict is attributable to [defendant's] current conduct, i.e., murder with a special circumstance finding, not his past criminal activity." (*People* v. *Cox* (1991) 53 Cal.3d 618, 690 [280 Cal.Rptr. 692, 809 P.2d 351].)

Defendant contends that evidence of *juvenile* misconduct is inadmissible under section 190.3, factor (b). We have repeatedly rejected such claims. (*People* v. *Cox, supra,* 53 Cal.3d at pp. 688-689; *People* v. *Burton, supra,* 48 Cal.3d at p. 862.)

Defendant also argues that the admission of this evidence without any requirement that the jury agree unanimously on his culpability for the

juvenile misconduct is a violation of the right to jury trial and the presumption of innocence, and the right under the Eighth Amendment to a reliable penalty determination. Again, defendant's rights to the presumption of innocence and a unanimous jury verdict with respect to the earlier misconduct are not implicated because defendant was not being tried for that misconduct. The penalty determination process simply does not require that the jury unanimously determine which factors in aggravation apply. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127]; see also *People* v. *Douglas* (1990) 50 Cal.3d 468, 532 [268 Cal.Rptr. 126, 788 P.2d 640].) The jury was instructed that in order to consider the evidence, it would have to determine that a crime of violence had been proved beyond a reasonable doubt; further instruction on the presumption of innocence was not necessary. (*People* v. *Kelly, supra,* 51 Cal.3d at pp. 965-966.) Further, we have recently rejected defendant's Eighth Amendment claim, and decline the invitation to reconsider. (*People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 135; see also *People* v. *Benson, supra,* 52 Cal.3d at pp. 788-789.) Defendant's reliance on *Johnson* v. *Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981] is misplaced. (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

 Defendant finally contends the court abused its discretion in refusing to exclude the evidence under Evidence Code section 352, as substantially more prejudicial than probative. However, " 'the court does not have discretion to prevent introduction at the penalty phase of *all* evidence of . . . a prior violent felony.' [Citations.] Rather, the court retains discretion to regulate, under section 352, the manner in which the evidence is presented." (*People* v. *Douglas, supra,* 50 Cal.3d at p. 531.) Defendant claims the evidence should have been *entirely* excluded because of its categorical prejudicial impact. His claim must be rejected.[6]

### b. *Rebuttal Evidence*

Defendant contends the trial court permitted, over his objection, improper rebuttal testimony and that the prosecutor failed to give proper notice of the rebuttal evidence. (§ 190.3.) He urges that the introduction of the rebuttal evidence without notice violated the due process clause of the state and federal Constitutions.

---

[6]Defendant asks that we declare evidence of juvenile sexual misconduct inadmissible by analogy to the holding of *Booth* v. *Maryland* (1987) 482 U.S. 496, 508-509 [96 L.Ed.2d 440, 451-452, 107 S.Ct. 2529], that evidence of the impact of a capital crime on the victim is irrelevant and inadmissible. The analogy fails with the high court's reconsideration of *Booth* v. *Maryland, supra,* 482 U.S. 496, in *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 734-735, 111 S.Ct. 2597, 2608]; see also *People* v. *Edwards, supra,* 54 Cal.3d at pp. 833, 836.) There being no indication that emotion overwhelmed reason in the penalty determination, we must reject the claim.

Defendant proffered the testimony of Pamela Saporito and Kimberly Perrina, who performed as dancers at a nightclub frequented by police officers. Ms. Saporito testified that she became friendly with defendant at the club. She observed that he always treated women gently, and that he was not aggressive, sexually or otherwise, with women at the nightclub. The other men were vulgar with women, but defendant was protective towards women. She was aware of no occasion that defendant had asked any women out on a date, except for one incident when he asked her to join him for a cup of coffee. He was not pushy about asking her out for coffee. He protected her against verbal and physical abuse from other men. He frequently walked her to her car after work. She was never afraid of defendant. Defendant never acted angry, violent or cruel. She was of the opinion he was not an angry person. She was shocked when she learned of his arrest.

Ms. Perrina also testified that defendant was very caring, and overly protective of the women at the club. She said defendant was always there to make sure other men did not bother the women working at the club. He treated the women there like a big brother. He was never aggressive, sexually or otherwise. He wrote her a letter once asking her for a date, but other than this incident, she knew of no overtures he had made to women at the club. Defendant showed no propensity for violence or "physical, forceful behavior." He seemed very quiet and lonely. She never saw him angry, and was shocked by his arrest.

In rebuttal, the prosecutor called three women who had worked at a shopping mall where defendant was employed as a security guard. Ms. Miller, the owner of a pet shop, testified that defendant pestered her and her employees with his attention. She said the situation became "overpowering," that defendant constantly wanted to escort her and her employees out of the shop, that he was constantly hanging around, bringing presents, and telephoning. He was almost always at her shop when he was on duty, and was sometimes there when he was not on duty. On one occasion he followed her home in his car, a trip of some 25 miles.

Ms. Knode, a pet store employee, confirmed that defendant frequented the store and paid attention to the female employees. At one point he started to watch her house. "He would park down the road and watch, I guess, when I came home from dates." When she confronted him about it, he said he was protecting her.

Ms. Nordby also testified that while she worked at the mall, defendant pestered her with attention, interfering with her work and with the work of other female employees. She also saw him at the high school she attended,

watching the students. He was not a student there. On one occasion at the school, he almost hit her with his car, and seemed to find this funny.

 The admission of rebuttal evidence is a matter for the sound discretion of the trial court. (*People* v. *Kelly, supra*, 51 Cal.3d at p. 965.) We see no "palpable abuse" of that discretion. (*Ibid.*) "[W]hen the defense presents mitigating evidence of a defendant's good character, it has put the defendant's character in issue, thus opening the door to prosecution evidence tending to rebut that 'specific asserted aspect of [the defendant's] personality.' [Citation.] Such rebuttal evidence, however, must be specific and 'must relate directly to a particular incident or character trait defendant offers in his own behalf.'" (*People* v. *Bacigalupo, supra*, 1 Cal.4th 103, 141.)

Defendant contends that the evidence he proffered put in issue his character only to the extent it related to his propensity for violence with women. We disagree. Defendant proffered evidence that he was gentle, shy and retiring with women, never aggressive. His evidence suggested that his characteristic relations with women were kind, selfless and chivalrous, and that he never or rarely took the initiative in establishing a sexual relationship. The prosecution witnesses testified to incidents that tended to contradict that view of his character. The evidence that he harassed the mall employees with his overpowering attention, and that he was aggressive to the point of following them home and "protecting" them when they were on dates with other men, tended to rebut his evidence in mitigation. We conclude that the challenged evidence was properly admitted.

Defendant also objects to the testimony of several other rebuttal witnesses, claiming it touched on matters he had not opened up in his case in mitigation. One Ms. Frazier testified that defendant used to come to her home uninvited about once a week. They attended the same high school, but she was not acquainted with him from school. He took her photograph uninvited. Her high school transcript was found in his bedroom. Ms. Bailey, who also attended high school with defendant and counted him as a friend of her family, testified that occasionally defendant spent the night in his car across the street from her house. Her transcript was also found in defendant's bedroom. The registrar of the high school testified that defendant had worked in her office, and identified a two-inch stack of manila folders found in defendant's bedroom as copies of records that were kept in her office. They were all records of female students.

This evidence also tended to rebut defendant's evidence that he was kind and unassuming with women, by showing a more brooding, aggressive quality in his relations with women. Defendant opened the door by putting in

issue his character in male-female relations and depicting himself as totally lacking in aggressiveness towards women. We see no error in admitting the evidence.

Defendant also objects to the following rebuttal evidence. Tracy S. testified that when she was 13 or 14, defendant, who was a security guard in her apartment building, asked her more than once whether he could take her photograph. Once he showed her pictures of nude women. He made her uneasy. This evidence may have been of marginal relevance to any issue raised in mitigation, but it was not erroneously received.

The prosecutor introduced several pornographic photographs of women in bondage seized from defendant's bedroom. The prosecutor offered the evidence to rebut defendant's claim, in his taped interviews with the police, that his actions were unpremeditated. We see no abuse of discretion in admitting the evidence. The evidence was also relevant to rebut defendant's claim that he had a respectful, kind and chivalrous attitude toward women.[7] (Compare *People* v. *Hovey* (1988) 44 Cal.3d 543, 575-576 [244 Cal.Rptr. 121, 749 P.2d 776] [under 1977 death penalty law, defendant's pornographic magazine admitted to rebut defendant's evidence he was a studious, artistic intellectual].)

Finally, defendant's father said that based in part on conversations he had had with his son, he thought that something, possibly the victims' behavior, "corrupted" defendant and caused him to "break." This was relevant, though marginally so, to rebut defendant's evidence of remorse, evidence that was before the jury in the form of his taped interviews with the police.

We see no palpable abuse of discretion in the trial court's determination that the rebuttal evidence proffered by the people was admissible. Although the testimony of Tracy S. was of marginal relevance, it carried no prejudice. To the extent it contained any suggestion of improper motivation toward a young girl, the evidence was cumulative to other, far more damning evidence of forcible lewd acts on children. Further, the prosecutor did not mention her testimony specifically in closing argument. (Compare *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1194 [270 Cal.Rptr. 286, 791 P.2d 965].) In fact, his reliance on the rebuttal evidence was minimal. Accordingly, we reject defendant's claim that the admission of the rebuttal evidence complained of requires reversal of the penalty verdict.

---

[7] Nor do we agree with defendant that the introduction of this evidence unconstitutionally aggravated the penalty decision on the basis of protected First Amendment activity or on any other basis. Unlike the situation in *Dawson* v. *Delaware* (1992) 503 U.S. __ [117 L.Ed.2d 309, 112 S.Ct. 1093], the evidence here was relevant rebuttal evidence.

Defendant also contends the court was obliged to instruct the jury sua sponte that the rebuttal evidence could not be considered as a factor in aggravation, but only could be considered to rebut his evidence in mitigation. We have recently rejected an identical claim. (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1073 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) In any event, as we read the record, the court did instruct the jury that apart from the evidence of lewd acts on a child and false imprisonment introduced in the prosecutor's case-in-chief, it could not consider any evidence of other criminal acts as an aggravating circumstance. Thus defendant's fear that the jury might have considered some of the rebuttal evidence under factor (b) is groundless. (*People* v. *Ramirez, supra*, 50 Cal.3d at p. 1194.)

Defendant's claim that he did not receive proper pretrial notice of the rebuttal evidence is unavailing. There is no right to such notice. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113].) Defendant claims a violation of due process in that the prosecutor "sandbagged" defendant by withholding evidence in aggravation until it was introduced in the guise of rebuttal. However, there is no evidence the prosecutor intentionally withheld evidence from the case-in-chief and reserved it for rebuttal. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 322 [261 Cal.Rptr. 348, 777 P.2d 121].) In fact, we see little possibility any of the rebuttal evidence would have been admissible in the prosecutor's case-in-chief. We perceive no violation of due process nor deviation from the constitutional norm of a fair and reliable penalty trial.

### c. *Photographs of Victims*

■ Defendant complains of the admission at the penalty trial of photographs of the victims in the ravine where he disposed of them. We have already rejected the argument in the context of the guilt phase of trial, and we reject it here as well. At the guilt trial, the evidence was relevant to show malice, premeditation and intent to torture. At the penalty trial, the evidence was also relevant to the issues of aggravation and penalty. It demonstrated graphically the circumstances of the crime and therefore was relevant to a determination of the appropriateness of the death penalty. (*People* v. *Benson, supra*, 52 Cal.3d at p. 786; *People* v. *Thompson, supra*, 50 Cal.3d at p. 182.)[8]

### 4. *Prosecutorial Misconduct*

Defendant claims the prosecutor committed misconduct at several points in his closing argument. He asserts that the improper argument " 'so infected

---

[8]Defendant, having failed to object to the evidence on the basis of the Eighth Amendment at trial, may not be heard to do so for the first time here. (*People* v. *Benson, supra*, 52 Cal.3d at p. 786, fn. 7.)

the trial with unfairness as to make the resulting conviction a denial of due process.'" (*Darden* v. *Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 157, 106 S.Ct. 2464].) He also argues that the remarks deprived him of the right to be free from an arbitrary or capricious sentencing procedure under the Eighth Amendment of the United States Constitution.

Defendant complains particularly of the prosecutor's emphasis on the personal characteristics of the victims. Over defense objection, the prosecutor argued: "But what about this case goes beyond just the ordinary victim? Jeanine was sixteen years old. She was very, very smart. She was fun to be with. Tracy [W.] knew her, said she was more innocent than most sixteen year olds. A child, very, very innocent. . . . [¶] Laurie thought she was pretty . . . [s]he was a young woman. She went to a private school up in San Mateo County, Crystal Springs Uplands. She was a young woman with her whole life ahead of her. . . . [¶] And in every case it's a tragedy, but where the life that's taken is that of a child, and that of a beautiful child, those injuries, that grief, that sorrow to that part of society that knows the victim, it can be haunting. It can take years to go away, and sometimes it never fades."

Defendant originally urged that the Eighth Amendment prohibits the prosecutor from arguing that the personal characteristics of the victim justify the imposition of the death penalty, relying on *Booth* v. *Maryland, supra,* 482 U.S. 496, and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]. Conceding that these authorities have been overruled in *Payne* v. *Tennessee, supra,* 501 U.S. __ [115 L.Ed.2d 720], he argued in his reply brief that *Payne* still leaves open to this court the option of declaring victim impact evidence and argument improper under the federal Constitution. He asks that as a matter of stare decisis, we adhere to past decisions, citing *People* v. *Marshall* (1990) 50 Cal.3d 907, 928-929 [269 Cal.Rptr. 269, 790 P.2d 676], and *People* v. *Benson, supra,* 52 Cal.3d at page 796.

We have recently explained that our decisions holding that victim impact evidence and argument are inappropriate in the penalty trial were largely based on *Booth* v. *Maryland, supra,* 482 U.S. 496, and *South Carolina* v. *Gathers, supra,* 490 U.S. 805. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 835.) Once those authorities no longer bound us, we explained our view of our statutory scheme and the limits of the Eighth Amendment in this context. We held that "factor (a) of section 190.3 allows evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim. This holding only encompasses evidence that logically shows the harm caused by the defendant." (*People* v. *Edwards, supra,* at p. 835.)

Of course, as defendant claims, some types of evidence and argument regarding the impact of the crime on the victim and the family may be improper. "Our holding also does not mean there are no limits on emotional evidence and argument. . . . '[T]he jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason. [Citation.] In each case, therefore, the trial court must strike a careful balance between the probative and the prejudicial. [Citations.] On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.'" (*People* v. *Edwards, supra,* 54 Cal.3d at p. 836.)

Thus we examine the prosecutor's argument to determine if it called upon irrelevant facts, or led the jury to be overcome by emotion. Youth and innocence are precious qualities to most people, and it does not seem unfair or unduly manipulative to draw attention to the harm caused by defendant in destroying them. The death of a child is a tragic, universal human theme, explored in religion, literature and art, from King David's cry for his slain son Absalom to Lear's torment at the loss of Cordelia, from Mahler's Kindertotenlieder to the ephemera of television. The tragedy of the death of an innocent could hardly be far from the jury's mind, even without the brief comments of the prosecutor. As in *Payne* v. *Tennessee, supra,* 501 U.S. __ [115 L.Ed.2d 720], in which the prosecutor called attention to the youth of one of the victims, and to the grievous loss suffered by a child who survived the attack that killed his mother and baby sister: "the testimony illustrated quite poignantly some of the harm that Payne's killing had caused; there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant." (*Id.* at p. __ [115 L.Ed.2d at p. 736].) Here the prosecutor's discussion was brief and far less emotional than the prosecutor's litany of pain and suffering and cry for vengeance in *Payne.* (See *id.* at pp. __-__ [115 L.Ed.2d at pp. 728-729].) We conclude that it violated neither the Eighth Amendment nor the due process clause of the federal Constitution.

 Defendant also claims prosecutorial misconduct because, in closing argument, the prosecutor referred to facts not in evidence. Specifically, the prosecutor said: "And perhaps almost the cruelest thing of all was the false hope that she had just before she died. Because they actually got her out of that ravine, they got her in the ambulance, they got her to a hospital." Defendant claims there was no evidence the victim felt any hope or loss of hope, or that defendant was culpable for what happened at the hospital.

Defendant did not object to the comment, and any harm could have been cured by an admonition. (*Green, supra,* 27 Cal.3d at p. 27.) In any event we see no misconduct; the prosecutor did not suggest he had information outside the record, but simply drew a permissible inference from the record. (Compare *People* v. *Edwards, supra,* 54 Cal.3d at p. 839; *People* v. *Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892].) The victim was conscious when she was rescued and taken to the hospital, and one witness testified that she smiled as if to say "thank God . . . I'm finally getting out of here." It can be inferred that she felt relieved to be rescued and hoped to survive. As to defendant's claim that the victim's hopes and fears near the time of her death were irrelevant to the penalty determination, we disagree. (*People* v. *Lewis, supra,* 50 Cal.3d at pp. 283-284; *People* v *Marshall, supra,* 50 Cal.3d at p. 929; see also *People* v. *Edwards, supra,* 54 Cal.3d at p. 839.)

Next, defendant claims the prosecutor misstated the evidence when he said that Jeanine had been "hogtied" when defendant threw her down the ravine. Defense counsel objected, and the court told the jury it was up to them to determine the accuracy of the statement. The prosecutor revised his description, saying that the victim's hands had been tied behind her back. The jury was also instructed that the arguments of counsel were not evidence. We see no possibility that the jury could have been misled.

Finally, defendant claims the prosecutor improperly characterized mitigating evidence as aggravating. He did not object on this basis at trial, and the claim is barred here. (*People* v. *Bell* (1989) 49 Cal.3d 502, 547 [262 Cal.Rptr. 1, 778 P.2d 129].) ■ In any event, the prosecutor was simply arguing that the evidence lacked the mitigating force the defendant claimed for it, a type of argument we have approved. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1062-1063 [251 Cal.Rptr. 757, 761 P.2d 680].) Thus defendant claimed his confession to the police showed remorse; the prosecutor was entitled to point out that he had denied culpability until he found out that one of his victims had survived and "he's not going anywhere." Defendant claimed the treatment he received at the hands of his mother should be weighed in mitigation; the prosecutor was entitled to urge the jury to look at the whole picture, including the advantages defendant had in schooling, housing, and early nurturing. Defendant suggested his sister had psychiatric problems because she was the product of a dysfunctional family; the prosecutor was entitled to suggest her problems may have stemmed from defendant's crimes.

In sum, we see no prosecutorial misconduct, and reject defendant's constitutional and state law claims.

## 5. Instructional Claims

### a. Residual Doubt

Defendant argues the court erred in refusing to instruct the jury on the concept of residual doubt, thereby violating his rights under the due process clause and the Eighth Amendment to the federal Constitution. He also claims error under state law, citing *People v. Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381]. However, it is settled that "the Eighth and Fourteenth Amendments do not require the jury be instructed to consider residual doubt as to the extent of [defendant's] participation in the offense, except as statutorily provided." (*People v. Cox, supra,* 53 Cal.3d at p. 677.) There is no state constitutional right to such an instruction, though "[a]s a matter of statutory mandate, the court . . . may be required to give a properly formulated lingering doubt instruction when warranted by the evidence." (*Id.* at p. 678, fn. 20.) Defendant's proposed instruction, however, was nearly identical with the instruction we rejected as argumentative and inaccurate in *People v. Cox, supra,* 53 Cal.3d at page 678, footnote 20.[9]

Here, the jury was fully instructed on the wide scope of evidence to be considered in mitigation. The court instructed the jury to consider the statutory factors in mitigation, including "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offered as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. . . . Mitigating circumstances are circumstances which do not constitute a justification or excuse for the offense in question, but which in fairness and mercy may be considered as mitigating or reducing the degree of moral culpability. [¶] Mitigating factors are unlimited. Mitigating factors provided in the instructions are merely examples of some of the factors you may take into account in deciding not to impose the sentence of death. [¶] You may also consider any other facts relating to the circumstances of the case or to the character and background of the defendant as a reason for not imposing the sentence of death. [¶] If any of the evidence presented arouses pity or compassion in you of such weight as to persuade you that death is not the appropriate punishment, you may act in response to these feelings and impose life imprisonment without the possibility of parole."

These instructions permitted the jury to consider any lingering doubt they may have had regarding defendant's culpability, and defense counsel thoroughly explored the issue in her closing argument. We see no error. (*People*

---

[9]The proposed instruction directed the jury's attention to any lingering doubt it might have regarding proof of intent to kill and intent to torture, and concluded: "If any of you have such a lingering or residual doubt, you must consider this as a mitigating factor and assign it the weight you feel is appropriate."

v. *Price* (1992) 1 Cal.4th 324, 488-489 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1245 [283 Cal.Rptr. 144, 812 P.2d 163].)

### b. *Deletion of Factors*

Defendant also contends the court erred in refusing his request that "inapplicable" factors be deleted from the instruction outlining the factors to be considered in aggravation and mitigation. His reliance on section 190.3 and existing state law on the instructional duties of the court is misplaced; we have consistently rejected this argument. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 104-105; see also *People* v. *Jones* (1991) 53 Cal.3d 1115, 1147 [282 Cal.Rptr. 465, 811 P.2d 757]; *People* v. *Beardslee* (1991) 53 Cal.3d 68, 113 [279 Cal.Rptr. 276, 806 P.2d 1311].) ▮ He also claims the due process clause and Eighth Amendment of the United States Constitution compelled that the instruction be edited as he proposed. We disagree, because, "as is apparent from the statutory language, it is for the jury to determine which of the listed factors are applicable or 'relevant' to the particular case." (*People* v. *Miranda, supra,* 44 Cal.3d at p. 105.) Having heard the full list of statutory aggravating and mitigating factors, "the jury is better able to place the individual defendant's conduct in perspective, and thus its exercise of discretion to select the appropriate penalty is further channeled and directed as required by the Eighth Amendment." (*People* v. *Jennings, supra,* 46 Cal.3d at p. 988.)

### c. *Identifying Factors*

Defendant also claims the court had a duty to identify each factor as either aggravating or mitigating, and that to the extent section 190.3 provides otherwise, it violates the Eighth Amendment. This argument has frequently been rejected and we decline to reconsider. (*People* v. *Andrews* (1989) 49 Cal.3d 200, 233 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Allison* (1989) 48 Cal.3d 879, 898 [258 Cal.Rptr. 208, 771 P.2d 1294].)

### d. *CALJIC No. 8.84.2*

Defendant claims that the court's instruction pursuant to the 1986 revision of CALJIC No. 8.84.2 violated his due process and Eighth Amendment rights.[10] He claims the instruction failed to inform the jurors that unless they found the factors in aggravation outweighed the factors in mitigation, they

---

[10]The court gave a modified version of CALJIC No. 8.84.2 (1986 rev.) (4th ed. pocket pt.) as follows: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole shall be imposed on the defendant. [¶]

could not impose a sentence of death, and failed to inform the jurors that if factors in mitigation outweighed factors in aggravation, they were obliged to reject the death penalty. He also claims the instruction was unconstitutionally vague and created a presumption in favor of death because it used the term "so substantial." We have rejected these arguments and approved the instruction as properly advising the jury of the manner in which it must exercise its sentencing discretion. (*People v. Breaux* (1991) 1 Cal.4th 281, 315-317 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People v. Sully, supra,* 53 Cal.3d at pp. 1243-1244.) Defendant presents no new argument or authority that would cause us to reconsider.

 In addition to the standard instruction, the court informed the jury: "Any mitigating factor standing alone may be sufficient to justify a sentence of life without possibility of parole, if you find that the weight of such a single mitigating factor outweighs the weight of all aggravating factors. [¶] It is the combined weight of the factors, not their number which is determinative. You are not merely to count the number of factors on each side." Defendant argues this language told the jurors that they could impose the death penalty even if it was not in their view appropriate, and "misled the jurors to believe they had discretion to impose a life sentence only if the mitigating evidence first persuaded them that death was not the appropriate sentence."

We see no reasonable likelihood, viewing the instructions as a whole, that the jurors understood the quoted language as defendant asserts. (*People v. Kelly, supra,* 1 Cal.4th at pp. 525-526.) Defendant seems to adhere to the view that the weighing process is somehow separate from the jury's determination of what penalty is appropriate; this is a view we have rejected.

---

After having heard all the evidence, and having received—let me start that again. [¶] After having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side, imaginary scale or arbitrary assignment of weight to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. [¶] In weighing the various factors, you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating factors with the totality of the mitigating factors. [¶] To return a judgment of death, you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole. [¶] Any mitigating factors standing alone may be sufficient to justify a sentence of life without possibility of parole, if you find that the weight of such a single mitigating factor outweighs the weight of all aggravating factors. [¶] It is the combined weight of the factors, not their number which is determinative. You are not merely to count the number of factors on each side. [¶] You shall now retire and select one of your number to act as foreman or forewoman, who will preside over your deliberations. [¶] In order to make a determination as to the penalty, all twelve jurors must agree."

(*People* v. *Boyde* (1988) 46 Cal.3d 212, 253-254 [250 Cal.Rptr. 83, 758 P.2d 25].) Weighing and the appropriateness determination are one process (*ibid.*); a jury that found a factor in mitigation outweighed the factors in aggravation has made the appropriateness determination and would not still feel free to select the death penalty. Further, the instruction as a whole informed the jury that it could decide, "even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death." (*People* v. *Duncan* (1991) 53 Cal.3d 955, p. 979 [281 Cal.Rptr. 273, 810 P.2d 131].) We conclude the instructions as a whole did not convey the idea that there was any presumption in favor of death.

### 6. *Cumulative Error*

Defendant claims that even if any one error was not prejudicial, cumulative prejudice requires reversal of the death judgment. We disagree; we have found no error or combination of errors prejudicial.

As for the reversal of the conviction for attempted oral copulation against Jeanine, the evidence of defendant's sexual misconduct could be considered under section 190.3, factor (a) even without the conviction. The evidence was overwhelming that defendant committed some forcible sexual offense against Jeanine, even if the precise nature of the offense was not clear. Further, the jury could properly consider defendant's conviction for a completed act of oral copulation against Laurie. Nor did the prosecutor emphasize either oral copulation conviction in his penalty phase argument to the jury. There is no reasonable possibility that the presence of an improper conviction for attempted oral copulation affected the penalty verdict, nor did the conviction deprive defendant of his right to a fair and reliable penalty determination under the state and federal Constitutions. (Compare *People* v. *Kelly, supra,* 1 Cal.4th at p. 551.)

### 7. *Automatic Application for Reconsideration*

Defendant claims the trial court improperly relied upon evidence contained in the probation report in denying defendant's automatic application for reconsideration of the death sentence. (§ 190.4, subd. (e).) It is true that the trial court may not consider the probation report in ruling on the motion; the court "is limited to the evidence presented to the penalty jury." (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1238 [275 Cal.Rptr. 729, 800 P.2d 1159].)

The trial court explained its task and its ruling as follows: "In ruling on the application, the judge shall review the evidence, consider and take into account and be guided by the aggravating and mitigating circumstances

referred to in section 190.3 and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to the law or the evidence presented in the case. The judge shall state on the record the reasons for his findings. [¶] And I have had the opportunity of reviewing the evidence and considering the mitigating and aggravating circumstances in connection with the case, and the court finds that the jury verdict was the just and proper verdict in this case, and that the verdict of the jury that the defendant shall suffer the death penalty is supported by the evidence and in consideration of the aggravating and mitigating circumstances. [¶] The court, in looking at the aggravating and mitigating circumstances, obviously in this case looking primarily to the circumstances surrounding the crime, as well as the special circumstances that the jury found to be true, the court has found that the crime was, not only brutal [,] torture did occur in connection with the crime, that the defendant had the opportunity to take a different course of action on several occasions, failed to, refused to do that, and pursued the death of the deceased in this case and the substantial injury of the young lady who did survive. [¶] Although the court feels that, believes that the jury verdict was the just and proper verdict in this case, that it should not be modified, and the court does not modify the verdict and leaves the verdict stand as returned by the jury. [¶] However, in connection with the case, the court has had prepared by the probation office, information for the department of corrections in connection with the commitment of the defendant to the department of corrections."

From this statement we conclude that the court had a proper understanding of its duty to independently reweigh the evidence in aggravation and miti-gation, and determine whether the evidence supported the jury's verdict. (§ 190.4, subd. (e), see *People* v. *Edwards, supra,* 54 Cal.3d at p. 846.) We see no evidence that the court relied on the probation report in denying the motion. The court relied on circumstances in aggravation that were the focus of the prosecutor's case at the penalty trial.

Defendant argues that because the court proceeded to sentence defendant on the noncapital crimes in reliance on the probation report immediately after denying the application for modification, without taking a recess, the court must have read the probation report before ruling on the motion. However, the record does not suggest that the court *relied* on any informa-tion contained in the probation report in denying the motion. ■ Even assuming that the court read the probation report before ruling on the motion, "absent evidence in the record to the contrary, we must assume that the court was not improperly influenced by the report in ruling on the application." (*People* v. *Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906], see also *People* v. *Sully, supra,* 53 Cal.3d at pp. 1250-1251;

*People* v. *Douglas, supra,* 50 Cal.3d at p. 540.) No such improper influence appears.

Defendant claims the court relied on the probation report because the clerk's transcript contains a copy of the report with the notation "The above report has been read and considered by the Court." However it is clear that the court considered and relied upon the probation report in connection with sentencing defendant on the noncapital crimes, a task the court performed after denying the motion for reconsideration.

Defendant also claims that the court's reasons for denying the motion were repeated "virtually verbatim" from the probation report. The probation report stated that the jury "realized the many opportunities the defendant had to end this vigil of terror. He did not do so." The court said, as noted above, "the defendant had the opportunity to take a differen[t] course of action on several occasions, failed to, refused to do that . . . ." We see little similarity in phraseology, and in any case, the point was one of the central themes of the prosecutor's closing argument, and indeed, was patently obvious from the evidence before the jury. Each of the reasons the court gave for denying the motion was clearly based on the evidence presented at the trial.

### III. CONCLUSION

The conviction for attempted oral copulation is reversed, and the judgment in all other respects is affirmed.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied August 13, 1992, and the opinion was modified to read as printed above.