[No. F019734. Fifth Dist. June 15, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY SCOTT CRAIG, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II-VII of Discussion.

1594

## COUNSEL

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Cynthia G. Besemer and Janis Shank McLean, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THAXTER, J.**—A jury convicted appellant Timothy Scott Craig on a single count of assault with intent to commit rape, a violation of Penal Code section 220.[1] In a bifurcated proceeding, the same jury found true allegations that appellant had suffered a prior conviction for a serious felony (§ 667, subd. (a)), and that he had served a prior prison term within the meaning of section 667.5, subdivision (b). The court sentenced appellant to the upper term of six years for the assault and imposed consecutive enhancements of five years and one year, respectively, for the prior conviction and the prior prison term, making an aggregate prison sentence of twelve years.

Appellant raises a multitude of issues on appeal. We will reject all of them except one relating to sentencing. We will conclude that the one-year enhancement must be stricken.

### FACTS

On February 11, 1993, sometime after 8 p.m., Lisa L. picked up her four-year-old son at her sister's house in the Hanford, California, area and drove towards the residence which she shared with Ron Riso. Riso's three-year-old son was also in the car. As she drove, Lisa noticed another vehicle following very closely behind hers. The other vehicle continued to follow, "pretty much bumper to bumper," as Lisa made at least three separate turns and drove on at least four streets.

As she arrived at her home, Lisa pulled her car into the driveway. The other vehicle, which was a small pickup truck, followed and stopped approximately a foot behind. Appellant, who had been driving the truck, got out and was standing near Lisa's car when she opened her door. Appellant said, "I'm sorry, I thought you were someone else," turned, and appeared to be

---

[1]All statutory references are to the Penal Code unless otherwise noted.

getting back into his truck. Lisa, who was then out of her car, placed her purse atop the car and helped her son get out of the backseat. She was immediately confronted by appellant who told her to turn around and put her hands on top of the car. He then grabbed Lisa by the hair, pushed her back into the driver's seat, and told her not to look at him. As Lisa struggled to look up, appellant then shoved his free hand up inside her sweater or shirt. He placed his hand flat against her chest, touching both of her breasts outside her bra.

Ron Riso was inside the house. His attention was attracted outside when he heard the two boys shouting. Looking out a window he saw Lisa in the driver's seat of her car with another person on top of her. Riso went outside and pulled appellant off Lisa. As he did so he saw appellant's hand coming out from under her shirt. Riso asked appellant what he was doing, and when he received no response, he hit appellant with his fist. Appellant ran around his truck, but Riso pursued and continued to hit appellant. At one point appellant offered Riso $100 "if you let me go right now." Riso struck him again, grabbed the keys to appellant's truck and locked appellant inside. Sheriff's deputies were called. When they arrived, appellant was sitting in his truck.

Appellant was arrested. After being *"Mirandized"*[2] he said he did not want to discuss the incident but volunteered a spontaneous statement that "I got a call saying my old lady was at that address. I went there, saw someone who looked like her; that's all I have to say."

Appellant testified that about 7 p.m. on February 11 he received a phone call from someone with whom he used to work. The caller told him the woman appellant had been dating was seeing some other man at an address on Curtis Street in Hanford. Appellant drove to that address, saw Lisa L. as she got out of her car, said, "No, you ain't the one," and was then attacked by Riso. He denied telling Lisa to place her hands atop her car, having any physical contact with Lisa, or offering Riso money to let him go. He admitted that in 1989 he was convicted on two counts of false imprisonment and two counts of attempted kidnapping.

During the prosecution's rebuttal, the court, over appellant's objection, admitted testimony by two women concerning two separate incidents occurring on September 11, 1988. Each witness testified that she was driving in the Hanford area that night and was followed home by appellant who approached her asking for directions. In each incident appellant pulled a

[2]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

knife, placed it near the victim's throat, and attempted to get the woman to go with him. He put his hand on the blouse and bra of each victim, fondling the breast of one, and put a hand underneath the skirt of one, touching her panties. Appellant fled from the scene of each incident, in one case after the victim began honking her car's horn, and in the other when the victim's passenger, who had been sleeping, attempted to help the victim.

## DISCUSSION

### I. *Sufficiency of Evidence*

■ The crime of which appellant was convicted, assault with intent to commit rape, requires proof that he intended to have sexual intercourse with Lisa and to use force to overcome her resistance. (*People* v. *Nye* (1951) 38 Cal.2d 34, 37 [237 P.2d 1].) ■ Appellant concedes there was substantial evidence from which the jury could find he intended "something sexual," committed forcibly or without consent. He claims, though, that the evidence fell short of showing he intended to accomplish an act of sexual intercourse.

■ "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People* v. *Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].) While ". . . we must ensure the evidence is reasonable, credible, and of solid value," we are not permitted to reweigh the evidence, reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact. (*Ibid.*; *People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887]; *In re Frederick G.* (1979) 96 Cal.App.3d 353, 367 [157 Cal.Rptr. 769].)

"The specific intent with which an act is done may be shown by a defendant's statement of his intent and by the circumstances surrounding the commission of the act." (*People* v. *Duke* (1985) 174 Cal.App.3d 296, 300 [219 Cal.Rptr. 873].) "In objectively assessing a defendant's state of mind during an encounter with a victim, the trier of fact may draw inferences from his conduct, including any words the defendant has spoken." (*People* v. *Bradley* (1993) 15 Cal.App.4th 1144, 1154 [19 Cal.Rptr.2d 276].)

Appellant relies on *People* v. *Greene* (1973) 34 Cal.App.3d 622 [110 Cal.Rptr. 160], in which a conviction of assault with intent to commit rape

was reversed, the appellate court concluding there was insufficient evidence of the specific intent. The victim, Linda, was a 16-year-old girl walking towards her home from a baby-sitting job. The *Greene* court summarized the victim's testimony as follows: ". . . The defendant, who approached from the direction in which Linda was walking, put his arm around her waist and turned her around. She thought his conduct was unusual, and she was startled and afraid. Defendant spoke in a soft voice and said, 'Don't be afraid. I have a gun. Don't move.' The defendant was on her right with his left arm around her waist, and she felt something hard against her right side. She did not look down to see whether it was a gun and did not know whether it was his finger, or a piece of metal or wood. The defendant told her to be quiet. At his request she placed her right arm around his waist and they started walking in the opposite direction from which she had been headed. Linda asked the defendant, 'What do you want?' or 'Oh God, what do you want?' and he replied, 'I just want to play with you.' She also remonstrated, 'Don't hurt me.' As they walked slowly the defendant had a hold of Linda and moved his left hand up and down her waistline, a little bit, in a manner which she demonstrated to the jury. An objection was sustained to Linda's volunteered statement, 'He just put his hand where he's not supposed to,' and a question and answer indicating he did 'other things.' When defendant indicated that he was going to play with her, Linda attempted to get away and shook her head and said 'No, no.' The defendant told her to stop it and be quiet. Linda remained quiet and then broke from defendant's embrace without a struggle, screamed and ran to a friend's home. According to Linda she only walked with the defendant past a couple of houses, and the whole incident took no more than six or seven minutes." (*Id.* at p. 650.)

The court concluded that Linda's testimony "when considered alone falls short of furnishing substantial evidence that the defendant assaulted her with intent to commit rape." (*People* v. *Greene, supra,* 34 Cal.App.3d at p. 651.)

The court also referred to evidence of other similar incidents involving the defendant which had been admitted at trial. In one incident, which occurred about four weeks prior to the one involving Linda, the defendant approached a fifteen-year-old girl who was walking home from a school dance. He told the girl he wanted to talk with her, but she tried to avoid him. The defendant continued to follow the girl, eventually grabbing her, pinning her arm with one of his arms, and shoving his other hand into her vaginal area. The girl freed her hand, hit the defendant with a pen, and broke away screaming until she entered her house. The appellate court concluded that the evidence of the defendant's acts on that occasion "could not impart greater meaning to similar acts" against Linda. (34 Cal.App.3d at p. 652.)

A third victim (Miss K.), who was 15 or 16 at the time of the incidents, testified that she was accosted by the defendant on 4 occasions about 18

months before the assault on Linda. In each of those incidents the defendant exposed himself, in three he expressed a desire to have sexual intercourse, and twice he offered the victim money for sex. The reviewing court opined that although that evidence may have shown some sexual motivation, it was "of little if any persuasive value on the issue to commit sexual intercourse, as distinguished from lascivious acts" in the incident involving Linda, during which the defendant neither said he desired intercourse, exposed himself, nor offered Linda money. The court further noted that the evidence was "of no persuasive value on the issue of intent to use force." (*People* v. *Greene*, *supra*, 34 Cal.App.3d at p. 653.)

Respondent argues that this case is factually distinguishable from *Greene* and cites *People* v. *Bradley*, *supra*, 15 Cal.App.4th 1144 as support for its assertion that sufficient evidence of a specific intent to rape is present here. In *Bradley* the defendant accosted a 16-year-old girl who was using a public telephone at nighttime outside a restaurant. He grabbed her by the hand and upper arm and walked her around the side of the building to a more dimly lighted dumpster area which was enclosed with a six-and-one-half-foot high block wall. He then pulled the victim's hair and head back, kissed her neck, and tried to kiss her mouth. Another man who was with the defendant and helped him guide the victim to the dumpster area said he would not mind "getting a 'piece of that' " and the defendant responded: " 'Don't worry, I will.' " The defendant used his free hand to caress the victim under her shirt and under her shorts to within an inch of her vaginal area. The victim could feel the defendant's erection pressing against her back. The assault stopped abruptly when car lights shone into the dumpster area and the victim kicked the defendant in the shins, after which he and his companion fled.

The *Bradley* court held that the evidence sufficiently supported the jury's finding that the defendant had the specific intent to commit rape. (15 Cal.App.4th at pp. 1154-1155.)

■ As we view them, the facts of this case fall somewhere between those in *Greene* and those in *Bradley*. We see three important areas in which comparisons may be made.

In *Greene* the defendant assured his victim that he only wanted to "play" with her, indicating that rape was not his goal. In *Bradley* the defendant and his companion exchanged comments about "getting a 'piece of that' " which suggested that intercourse was the defendant's aim. Here, appellant made no statements suggesting that his intent was to commit rape or that it was not.

There was, however, evidence that in a prior assault on another victim, under very similar circumstances, appellant said "come with me now, or I'll do it here, now" and "I want you now." While those statements may be susceptible of more than one meaning, the phrase "do it" is frequently employed as a euphemism for other terms connoting an act of sexual intercourse, and "I want you" can be interpreted as stating a desire for intercourse.

In *Greene* the defendant's physical act was putting his arm around the victim's waist and moving his hand around her waistline, all of which was consistent with his declaration that he only wanted to "play" with her. In *Bradley* the defendant placed his hand under the victim's clothing, touching her breast and coming close to her vaginal area. Here appellant placed his hand under Lisa's shirt to her breasts. There was also evidence that in a prior similar attack on another victim appellant slid his hand up her skirt to her panties. The evidence of physical acts leading towards intercourse was stronger here than it was in *Greene*.

Finally, in *Greene* the assault ended when the victim simply pulled away from the defendant without a struggle, and he did not pursue her. In both *Bradley* and this case, though, the attacker was interrupted by some intervening force. A reasonable inference can be drawn that appellant would have continued to pursue a sexual end if Riso had not physically pulled appellant off Lisa and struck him.

Appellant also cites *People* v. *Raley* (1992) 2 Cal.4th 870 [8 Cal.Rptr.2d 678, 830 P.2d 712], in which the Supreme Court found evidence insufficient to sustain a conviction for attempted oral copulation. In *Raley* the defendant locked two girls (Jeanine and Laurie), ages 16 and 17, in a basement safe, required them to remove their clothes, handcuffed them as they emerged from the safe in their underwear, brandished a large knife, and told the girls he would release them after they "fool[ed] around" with him for 5 minutes. He led Jeanine to a separate area. Laurie heard Jeanine scream. After about 15 minutes the defendant and Jeanine, now clothed, returned. Jeanine appeared frightened and her lips and face were purple, possibly from cold. The defendant then led Laurie to a kitchen and forced her to orally copulate and manually manipulate his penis.

After the sexual attacks on Laurie, the defendant stabbed and beat each girl numerous times and placed them in the trunk of his car. Many hours later, after further beatings, he threw them down a ravine. Laurie was able to crawl up a hill and flag down help. When rescuers arrived, Jeanine was still

alive and, hearing someone mention rape, became distraught and explained she had not been raped, but that the defendant had made her remove her clothes and "fool around" with him. Tragically, Jeanine died as emergency room doctors tried to treat the injuries inflicted by the defendant.

The defendant was convicted by a jury of several offenses, including attempted oral copulation by force against Jeanine. The Supreme Court held, however, that while there was "substantial evidence of a forcible sexual attack of some kind on Jeanine," the inference that because he committed a forcible oral copulation against Laurie he may have attempted the same against Jeanine was based on "layers of inference far too speculative to support the conviction." (2 Cal.4th at p. 890.) The court stated that because the defendant forced Laurie to engage in more than one type of sexual activity, the phrase "fooling around" apparently meant more than one thing to him and was not necessarily restricted to oral copulation. The court further rejected as speculative the argument that Jeanine used the term as referring to oral copulation even if that was the sense in which the defendant used it. Finally, the court found significance in the fact that the jury found not true a special circumstance allegation that Jeanine's murder occurred in the commission or attempted commission of oral copulation. (*Id.* at p. 891.)

The factual pattern and the issue considered in *Raley* are so different from those here that we do not consider it controlling. In *Raley* the question was not limited to the defendant's intent but extended to what his actual conduct was. The only evidence of *any* sexual attack on Jeanine was an inference drawn from all the circumstances, but those circumstances did not reveal the nature of the sexual assault. There was no evidence as to what precisely occurred between the defendant and Jeanine while they were outside Laurie's presence, and there was no physical evidence of an attempted oral copulation. Without knowing what the defendant did or tried to do to Jeanine, the *Raley* jury could only speculate on whether his conduct was consistent or inconsistent with an attempt to accomplish forcible oral copulation. Here, by contrast, Lisa directly testified that appellant forcibly grabbed her and placed one of his hands under her clothing. That conduct is consistent with an intent to commit rape.

Even if the *Raley* defendant's intent to commit forcible oral copulation could be inferred from his "fool around" statement, he could not be convicted of an attempt to commit that crime without substantial evidence of a direct but ineffectual act done toward its commission. (§ 21a.) Here there was clearly substantial evidence that appellant committed a sexual assault on Lisa, the only question being whether he had the requisite specific intent to rape.

Respondent cites *People* v. *Dobson* (1970) 12 Cal.App.3d 1177 [91 Cal.Rptr. 443] and *People* v. *Collier* (1952) 113 Cal.App.2d 861 [249 P.2d 72], both of which found sufficient evidence to support a conviction of assault with intent to commit rape when a man assaulted a woman without attempting to steal money or property from her.

Appellant acknowledges the cases cited by respondent, but argues that whatever strength those cases may have previously had was lost in 1982 when the Legislature enacted section 243.4, defining the crime of sexual battery.[3] According to appellant, ". . . [T]he very existence of [] section 243.4 reflects a more discriminating and exacting approach to the subject of

---

[3]Section 243.4, at the time of the acts committed by appellant, provided: "(a) Any person who touches an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, and if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery. A violation of this subdivision is punishable by imprisonment in a county jail for not more than one year, and by a fine not exceeding two thousand dollars ($2,000); or by imprisonment in the state prison for two, three, or four years, and by a fine not exceeding ten thousand dollars ($10,000).

"(b) Any person who touches an intimate part of another person who is institutionalized for medical treatment and who is seriously disabled or medically incapacitated, if the touching is against the will of the person touched, and if the touching is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery. A violation of this subdivision is punishable by imprisonment in a county jail for not more than one year, and by a fine not exceeding two thousand dollars ($2,000); or by imprisonment in the state prison for two, three, or four years, and by a fine not exceeding ten thousand dollars ($10,000).

"(c) Any person who, for the purpose of sexual arousal, sexual gratification, or sexual abuse, causes another, against that person's will while that person is unlawfully restrained either by the accused or an accomplice, or is institutionalized for medical treatment and is seriously disabled or medically incapacitated, to masturbate or touch an intimate part of either of those persons or a third person, is guilty of sexual battery. A violation of this subdivision is punishable by imprisonment in a county jail for not more than one year, and by a fine not exceeding two thousand dollars ($2,000); or by imprisonment in the state prison for two, three, or four years, and by a fine not exceeding ten thousand dollars ($10,000).

"(d)(1) Any person who touches an intimate part of another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of misdemeanor sexual battery, punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding six months, or by both that fine and imprisonment. However, if the defendant was an employer and the victim was an employee of the defendant, the misdemeanor sexual battery shall be punishable by a fine not exceeding three thousand dollars ($3,000), by imprisonment in a county jail not exceeding six months, or by both that fine and imprisonment. Notwithstanding any other provision of law, any amount of a fine above two thousand dollars ($2,000) which is collected from a defendant for a violation of this subdivision shall be transmitted to the State Treasury and, upon appropriation by the Legislature, distributed to the Department of Fair Employment and Housing for the purpose of enforcement of the California Fair Employment and Housing Act (Part 2.8 (commencing with Section 12900) of Division 3 of Title 2 of the Government Code), including, but not limited to, laws that proscribe sexual harassment in places of employment. However, in no event shall an amount over two thousand dollars ($2,000) be transmitted to the State Treasury until all fines,

sex crimes. And the Legislature, which has seen fit to include within the ambit of section 220 assaults with intent to commit any number of other sex crimes (see Stats. 1979, ch. 944, § 3), has chosen *not* to include within its ambit an assault with intent to commit 'sexual battery.'" (Fn. omitted.)

In his closing brief appellant continues the argument: ". . . [T]oday, when it is proved the assailant intended (only) 'something sexual'—such as to touch the woman's private parts, or to look at them—what has been proven is an intent to commit 'sexual battery,' not an intent to commit rape." (Fn. omitted.)

Appellant seems to argue that evidence sufficient under the sexual battery statute is necessarily insufficient under section 220. We fail to see the logic of that argument. Indeed, it seems precluded by section 243.4, subdivision (g), which expressly provides that "[t]his section shall not be construed to

---

including any restitution fines that may have been imposed upon the defendant, have been paid in full.

"(2) As used in this subdivision, 'touches' means physical contact with another person, whether accomplished directly, through the clothing of the person committing the offense, or through the clothing of the victim.

"(e) As used in subdivisions (a), (b), and (c), 'touches' means physical contact with the skin of another person whether accomplished directly or through the clothing of the person committing the offense.

"(f) As used in this section, the following terms have the following meanings:

"(1) 'Intimate part' means the sexual organ, anus, groin, or buttocks of any person, and the breast of a female.

"(2) 'Sexual battery' does not include the crimes defined in Section 261 or 289.

"(3) 'Seriously disabled' means a person with severe physical or sensory disabilities.

"(4) 'Medically incapacitated' means a person who is incapacitated as a result of prescribed sedatives, anesthesia, or other medication.

"(5) 'Institutionalized' means a person who is located voluntarily or involuntarily in a hospital, medical treatment facility, nursing home, acute care facility, or mental hospital.

"(6) 'Minor' means a person under 18 years of age.

"(g) This section shall not be construed to limit or prevent prosecution under any other law which also proscribes a course of conduct that also is proscribed by this section.

"(h) In the case of a felony conviction for a violation of this section, the fact that the defendant was an employer and the victim was an employee of the defendant shall be a factor in aggravation in sentencing.

"(i) A person who commits a violation of subdivision (a), (b), or (c) against a minor when the person has a prior felony conviction for a violation of this section shall be guilty of a felony, punishable by imprisonment in the state prison for two, three, or four years and a fine not exceeding ten thousand dollars ($10,000).

"(j) Upon conviction of a felony for a violation or attempted violation of this section committed on or after January 1, 1993, the court may enter an order requiring that the defendant register pursuant to Section 290."

limit or prevent prosecution under any other law which also proscribes a course of conduct that also is proscribed by this section."[4]

We are not persuaded that the Legislature, by simply enacting section 243.4, intended to affect the degree or type of proof required to show an assault with intent to commit rape.

We believe from the entire melange of circumstances shown by the evidence, a reasonable trier of fact could infer that appellant assaulted Lisa with the specific intent of committing rape. All of his conduct was consistent with that intent. Nothing he did or said indicated that he intended only to place his hands on her body or to accomplish some sexual act short of or different from intercourse. While other reasonable inferences also might be drawn, it was for the jury, not us, to draw them.

II.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The matter is remanded to the trial court with directions to strike one-year enhancement of appellant's sentence for his prior prison term under section 667.5, subdivision (b), and to send to the Department of Corrections a corrected abstract of judgment. In all other respects, the judgment is affirmed.

Ardaiz, Acting P. J., and Franson, J.,† concurred.

Appellant's petition for review by the Supreme Court was denied September 21, 1994.

---

[4]Appellant's trial counsel expressly informed the trial court that as a matter of tactics he was not requesting an instruction on the lesser-related offense of sexual battery because of appellant's testimony that there was no physical contact between him and Lisa.

*See footnote, *ante*, page 1593.

†Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.