Filed 11/2/15  P. v. Terrell CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065431 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN320008) |
| MATTHEW TERRELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

A jury found Matthew Terrell guilty of assault with intent to commit rape or oral copulation (Pen. Code, § 220, subd. (a))[1] (count 1) and false imprisonment by force, violence, menace, fraud, or deceit (§§ 236, 237) (count 2). The trial court sentenced Terrell to the upper term of six years on the conviction for assault with intent to commit rape or oral copulation and the upper term of three years on the conviction for false imprisonment. The court stayed execution of the sentence on the false imprisonment conviction pursuant to section 654.

On appeal, Terrell contends that there is insufficient evidence in the record to support the jury's verdict finding him guilty of assault with the intent to commit rape or oral copulation. We affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2013, Terrell contacted the 20-year-old victim, Emily M. (Emily), via a Web site. Terrell offered Emily the opportunity to earn $50 an hour and get free athletic wear in exchange for reviewing and modeling athletic wear, and agreeing to be photographed in the clothes. Emily agreed. Terrell told Emily that the photo shoot would take place at a beach the following day, and that she should meet him at his motel room near the beach in order to change into the clothes.

---

[1]     Unless otherwise specified, all subsequent statutory references are to the Penal Code.

2

Emily arrived at Terrell's motel room the following day, selected a pair of running shorts that Terrell had placed on the bed, and went into the bathroom to change. When she came out, Terrell asked her if she would like to pose in her sports bra or keep her shirt on. Emily chose to keep her shirt on. Terrell instructed Emily to assume various poses, including a backbend and a handstand, while he took photographs of her. Terrell then asked Emily to assume a pose with her hands behind her back. Emily attempted the pose, but Terrell told her that she was not doing it quite right. After obtaining Emily's permission to touch her, Terrell began to reposition her arms behind her back. While doing so, Terrell placed zip ties around Emily's wrists, explaining that this would help her hold the pose.

Shortly after placing the zip ties around her wrists, Terrell grabbed Emily's shoulders, dragged her toward the bed, and shoved her down on the bed. Emily was "flailing and struggling," while lying on her back with her wrists zip tied underneath her body. Terrell climbed on top of Emily, holding her shoulders down and pinning her to the bed. A brief struggle ensued, during which Emily bit Terrell's neck. Terrell eased up momentarily, allowing Emily to slip out from beneath him and off the bed. Emily began screaming loudly.

Terrell pushed Emily back against the bed. She continued to loudly scream, "Help, help!" Terrell attempted to place his hand over Emily's mouth while she was screaming, but she bit his hand. Emily was able to free herself from the zip tie and get to her feet. Terrell told Emily that he would let her go, but blocked the door to the room,

3

preventing her from immediately leaving. Moments later, Terrell moved away from the door and Emily was able to flee the room.

Two other male guests had heard Emily screaming. One of the men called 911 and the other walked toward the room from which the men had heard the screaming.

Police arrived and detained Terrell. A search of the room revealed the zip tie that Terrell had used to restrain Emily, as well as two bags of similar zip ties in a cubicle below the television. Police also found nine pairs of women's athletic shorts on the night stand. Six of the shorts did not have "panty liners."[2] With respect to at least one of the pairs of shorts, it appeared the panty liner had been "cut out or removed." In addition, police found a "ball gag" under the bed.[3] In a backpack, police found additional zip ties, duct tape, a belt with a buckle, a pair of scissors, a crescent wrench, several clothes pins, part of an electrical cord, and a panty liner from women's athletic shorts. Police also recovered a camera that contained photographs of Emily, wearing athletic shorts, striking various poses.

Police also searched Terrell's bedroom and found additional zip ties, part of an electrical cord that appeared to match a portion of an electrical cord found in Terrell's backpack, and five panty liners that appeared to have been cut out from shorts or pants.

---

[2]     During questioning, the prosecutor described the panty liner as "a brief/liner in women's running shorts."

[3]     An officer testified that the ball gag was comprised of a zip tie wrapped in duct tape. The officer described the nature of the ball gag as follows:
    "The way it's fashioned here, it looks like it's kind of bigger at one end, which would probably be strapped deep into the mouth so the person cannot create any type of noise or emit any type of screams or something like that."

## III.

## DISCUSSION

*There is sufficient evidence in the record to support the jury's verdict finding Terrell guilty of assault with the intent to commit rape or oral copulation*

Terrell contends that there is insufficient evidence in the record to support the jury's verdict finding him guilty of assault with the intent to commit rape or oral copulation. Specifically, Terrell contends that the jury's verdict rested on speculation that his intent during the assault was to rape or orally copulate the victim.

A.       *Governing law and standard of review*

1.       *The law governing challenges to the sufficiency of the evidence*

"A state court conviction that is not supported by sufficient evidence violates the due process clause of the Fourteenth Amendment and is invalid for that reason." (*People v. Rowland* (1992) 4 Cal.4th 238, 269, citing *Jackson v. Virginia* (1979) 443 U.S. 307, 313-324.) In determining the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia*, *supra*, at p. 319.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "The standard of

5

review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

2. *The offense of assault with intent to commit rape or oral copulation*

Section 220, subdivision (a) provides in relevant part: "[A]ny person who assaults another with intent to commit . . . rape . . . [or] oral copulation . . . shall be punished . . . ." "[S]ection 220 requires not only the specific intent to commit the underlying sexual act, but a specific intent to commit that act without the consent of the victim." (*People v. Dillon* (2009) 174 Cal.App.4th 1367, 1378.)

3. *Proof of a defendant's intent*

"Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420 (*Pre*).) " 'The specific intent with which an act is done may be shown by a defendant's statement of his intent and by the circumstances surrounding the commission of the act.' " (*People v. Craig* (1994) 25 Cal.App.4th 1593, 1597, quoting *People v. Duke* (1985) 174 Cal.App.3d 296, 300 (*Duke*).)

B.   *Application*

The People presented evidence that Terrell concocted an elaborate ruse in order to lure the victim to a motel room. Once the victim was in the room, Terrell instructed her to model revealing clothing. After the victim had donned the clothing, Terrell instructed her to assume poses that the jury could have reasonably found were sexually suggestive and began taking photographs of her. Then, using another ruse, Terrell bound the victim's wrists in zip ties, before forcibly throwing her onto the bed and climbing on top

6

of her.  Terrell pinned the victim to the bed by holding her shoulders down.  He relented only when the victim bit him on the neck and engaged in a physical struggle during which she was able to slide out from under him.  While the victim was screaming, Terrell placed his hand over her mouth in an attempt to silence her.  Prior to luring the victim to the motel room, Terrell hid items in the room that could be used to facilitate sexual conduct, including a ball gag and clothes pins.[4]  In addition, the People presented evidence that Terrell had cut the panty liners out of several of the shorts that he brought to the room for the victim to model.  A jury could reasonably infer that Terrell cut the panty liners from the shorts in order to facilitate his access to the victim's genitalia.  In light of all of the evidence mentioned above, a reasonable jury could find that, at the time Terrell assaulted the victim, he harbored the intent to rape or orally copulate her.

Terrell's arguments to the contrary are not persuasive.  Terrell notes that "[h]e did not tell [the victim] he wanted to have sexual intercourse."  While there is no evidence that Terrell stated his intentions, "intent is rarely susceptible of direct proof . . . ."  (*Pre*, *supra*, 117 Cal.App.4th at p. 420.)  Terrell also argues that he did not "touch [the victim] sexually."  Even assuming that this is true,[5] the jury could reasonably infer from the evidence discussed above that Terrell intended to sexually assault the victim, and that he was prevented from doing so only by her fierce resistance.

---

[4]     The jury was presented with testimony that ball gags are commonly used by clients of prostitutes to engage in sexual fantasies.  The prosecutor argued that the clothes pins could be used as "nipple clamps" or "genital clamps."

[5]     The People contend that the jury could reasonably find that Terrell touched the victim in a sexual way, when he threw her down on the bed and climbed on top of her.

*Duke*, *supra*, 174 Cal.App.3d 296, cited by Terrell, does not compel a different result.  In *Duke*, the defendant groped the clothing covering the intimate parts of three different women.  (*Id.* at p. 299.)  He was charged with three counts of attempted sexual battery.  (*Id.* at p. 298.)  At the time, sexual battery required "actual direct contact with the skin of the intimate part of the victim."  (*Id.* at p. 299.)  On appeal, the defendant challenged the sufficiency of the evidence.  (*Id.* at pp. 299-300.)

The *Duke* court reasoned that a judicially imposed limitation on the type of evidence that could be deemed sufficient to satisfy proof of an *attempted* sexual battery was necessitated by the fact the Legislature had mandated that the commission of a completed sexual battery required contact with the victim's skin:

> "Normally, the question whether the circumstances surrounding the act show the required specific intent is for the jury.  However, the Legislature has obviously recognized a fact of life—that some sexually assaultive persons get a kick or gratification by touching other persons in the clothed areas of their intimate parts without intending to go farther by touching the skin of the intimate part—absent the victim's consent."  (*Duke*, *supra*, 174 Cal.App.3d at p. 300.)

In order to preserve the "legislative policy" (*Duke*, *supra*, 174 Cal.App.3d at p. 300), that direct contact by the defendant to the skin of a victim was required in order to commit a sexual battery, the *Duke* court developed a "bright line" rule (*ibid.*), that "there must be some proof of the defendant's intent to touch the skin of the victim's intimate parts in addition to the mere grabbing or touching of the victim through his or her clothing."  (*Id.* at p. 301.)  Because there was no such evidence in *Duke*, the Court of Appeal concluded that the evidence did not support the attempted sexual battery verdicts.  (*Id.* at p. 302.)

8

Even assuming that we were to agree with the reasoning of the *Duke* court, we are not aware of any analogous "bright line" rules (*Duke*, *supra*, 174 Cal.App.3d at p. 300) concerning the sufficiency of the evidence necessary to prove assault with the intent to commit rape or oral copulation.[6] Thus, in determining whether a defendant intended to rape or orally copulate a victim of an attack, the ordinary rule, namely, that the jury may infer a defendant's intent from all of the "facts and circumstances surrounding the offense," applies. (*Pre*, *supra*, 117 Cal.App.4th at p. 420; see *Duke*, *supra*, at p. 300 ["Normally, the question whether the circumstances surrounding the act show the required specific intent is for the jury."].) In this case, the facts, as described above, are sufficient for the jury to infer that Terrell committed his assault of the victim with the intent to rape or orally copulate her.

Terrell also "directs this [c]ourt" to *People v. Greene* (1973) 34 Cal.App.3d 622 (*Greene*), in which the Court of Appeal concluded that there was insufficient evidence that a defendant committed an assault with the intent to rape the victim. In *Greene*, the People presented evidence that the defendant approached the 16-year-old victim (Linda) as she was walking home from a babysitting job at approximately 11:00 p.m. (*Id.* at p. 629.) The *Greene* court summarized the evidence concerning the ensuring encounter as follows:

> "The defendant, who approached from the direction in which Linda was walking, put his arm around her waist and turned her around. She thought his conduct was unusual, and she was startled and afraid. Defendant spoke in a soft voice and said, 'Don't be afraid. I

---

6      In any event, unlike in *Duke*, there is no evidence that Terrell *voluntarily* stopped his assault of the victim. (See *Duke*, *supra*, 174 Cal.App.3d at p. 299 ["After touching Erica's groin area, 'he just kind of let go and started running out of the house.' "].)

have a gun. Don't move.' The defendant was on her right with his left arm around her waist, and she felt something hard against her right side. She did not look down to see whether it was a gun and did not know whether it was his finger, or a piece of metal or wood. The defendant told her to be quiet. At his request she placed her right arm around his waist and they started walking in the opposite direction from which she had been headed. Linda asked the defendant, 'What do you want?' or 'Oh God, what do you want?' and he replied, 'I just want to play with you.' She also remonstrated, 'Don't hurt me.' As they walked slowly the defendant had a hold of Linda and moved his left hand up and down her waistline, a little bit, in a manner which she demonstrated to the jury. An objection was sustained to Linda's volunteered statement, 'He just put his hand where he's not supposed to,' and a question and answer indicating he did 'other things.' When defendant indicated that he was going to play with her, Linda attempted to get away and shook her head and said 'No, no.' The defendant told her to stop it and be quiet. Linda remained quiet and then broke from defendant's embrace without a struggle, screamed and ran to a friend's home. According to Linda she only walked with the defendant past a couple of houses, and the whole incident took no more than six or seven minutes." (*Id.* at p. 650.)

The People presented evidence that the defendant had committed another charged sexual offense against a second victim (Terese). (*Greene*, *supra*, 34 Cal.App.3d at p. 627.)[7] During this offense, which occurred less than a month prior to the charged offense involving Linda, the defendant approached Terese on the street and asked her to come with him. (*Id.* at p. 628.) When she declined, the defendant grabbed her with one arm and shoved his other hand into her vaginal area. After approximately 30 seconds, Terese was able to free herself and flee. (*Ibid.*)

The People also presented evidence of several additional incidents during which the defendant attempted to have sex with a teenage girl whom he met on the street. Each of the incidents occurred approximately 18 months before defendant's encounter with Linda and involved the same victim, Miss K. (*Greene*, *supra*, 34 Cal.App.3d at p. 631.) During one of the encounters, the defendant approached Miss. K. on the street and told

---

7    The *Greene* court concluded that the jury could consider evidence pertaining to the defendant's offense against Terese in considering whether he was guilty of committing the offense against Linda. (*Greene*, *supra*, 34 Cal.App.3d at p. 630.)

10

her that he wanted to have sexual intercourse.  The defendant then grabbed Miss. K. before she was able to flee.  (*Ibid.*)  On another occasion, the defendant offered Miss K. $100 to have sex with him, and then pushed her into some bushes before she was able to run away.  (*Id.* at p. 632.)  On still another occasion, the defendant offered Miss K. $50 to have intercourse, blocked her path when she attempted to leave, and grabbed her in the crotch before she was able to flee.  (*Ibid.*)  Miss K. testified that the defendant exposed himself during each of the incidents.  (*Ibid.*)

In concluding that the evidence was insufficient to support the jury's verdict finding the defendant guilty of assault with intent to rape Linda, the *Greene* court stated, "The testimony of Linda when considered alone falls short of furnishing substantial evidence that the defendant assaulted her with intent to commit rape." (*Greene*, *supra*, 34 Cal.App.3d at p. 651.)  In support of this conclusion, the court cited the facts of several cases in which the People had presented stronger evidence of the defendant's intent to commit a rape.  (*Id.* at pp. 651-652.)  The *Greene* court also concluded that the evidence of the defendant's commission of the other offenses "fail[ed] to rise to the dignity of showing intent to overcome his victim's resistance by force or violence."  (*Id.* at p. 653.)  In support of this conclusion, the *Greene* court again reasoned that the evidence did "not measure up to the facts" of several other cases in which the People had presented stronger evidence of a defendant's intent to rape.  (*Ibid.*)

We are not persuaded that *Greene* requires reversal in this case.  To begin with, we disagree with the *Greene* court's conclusion that no reasonable jury could find that the defendant committed an assault with the intent to rape Linda.  In light of Linda's

11

testimony concerning the defendant's threat, his statement that he wanted to "play" with her, and the placement of his hand on her waist, together with the evidence that the defendant had committed several other similar offenses that were clearly sexually motivated, a juror could reasonably infer that the defendant assaulted Linda with the intent to rape her.

The *Greene* court's reasoning to the contrary was based primarily on its assessment that the evidence in that case was weaker than that presented in other cases. However, the Supreme Court has cautioned against such an approach to evaluating sufficiency claims. (See *People v. Story* (2009) 45 Cal.4th 1282, 1299 ["The Court of Appeal erred in focusing on evidence that did not exist rather than on the evidence that did exist."].) Accordingly, we decline to follow *Greene*.

In any event, even if we were to follow *Greene*, it is distinguishable. Unlike the brief encounter on the street in *Greene*, the defendant in this case executed an elaborate plan to trick the victim into coming to a motel room in which he had placed several items that a reasonable juror could find would facilitate a rape or oral copulation. In addition, unlike in *Greene*, the defendant's act in binding the victim's wrists, throwing her on the bed, and climbing on top of her, showed a clear "intent to overcome his victim's resistance by force or violence." (*Greene*, *supra*, 34 Cal.App.3d at p. 653.)

Accordingly, we conclude that there is sufficient evidence in the record to support the jury's verdict finding Terrell guilty of assault with the intent to commit rape or oral copulation.

IV.

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

McINTYRE, Acting P. J.

O'ROURKE, J.